UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SLEP-TONE ENTERTAINMENT CORPORATION,

    Plaintiff,

v.

JOHN COYNE d/b/a EXTREME KARAOKE and ABSOLUTE DISC JOCKEYS; MITCH PALMER; ALLEN MANDO; TONY GONZALEZ; TIM THOMAS; RACHEL YACKLEY; ANGIE ONTHENIC; PETER GARCIA; and KENNY SEIDMAN d/b/a DJ KENNY B,

    Defendants.

Case No. 1:13-cv-2298

## **COMPLAINT**

The Plaintiff, Slep-Tone Entertainment Corporation ("Slep-Tone"), by and through its attorneys, hereby complains of the Defendants, and for its complaint alleges as follows:

## **INTRODUCTION**

Slep-Tone is the manufacturer and distributor of karaoke accompaniment tracks sold under the name "Sound Choice." Kurt and Derek Slep, two brothers with a vision to nurture the development of karaoke in America as a participatory entertainment phenomenon, founded Slep-Tone twenty-eight years ago. During that time, Sound Choice came to be recognized as one of the leading producers of high-quality karaoke accompaniment tracks. The company invested over $18 million to re-record and replicate the authentic sound of popular music across different eras and genres of music.

The Sleps' dedication to producing music of the highest quality and the most authentic character led its music to become the staple of almost every karaoke show in the country. As

COMPLAINT – Page 1

karaoke grew in popularity, Sound Choice became the brand that nearly every karaoke fan wanted to sing and that nearly every karaoke jockey ("KJ") wanted in his or her library.

KJs play karaoke songs using compact discs containing files written in one of two special encoded formats, either "CD+G" ("compact disc plus graphics") or "MP3G" ("MP3[1] plus graphics"), in which the disc contains the music and the lyrics, which will display on a screen. In recent years, computer technology, cheap file memory devices, and the internet have made it possible for karaoke discs to be decoded and "ripped" (copied) to a user's hard drive and easily copied and distributed between KJs. This technology has proven irresistible to KJs, many of whom have used this opportunity to copy one purchased disc to several different computer based systems, copy a singer's personal discs if they use them during a show, "swap" song files among each other, download them from illegal file-sharing sites and build libraries of tens of thousands of karaoke songs without paying for them. Whereas in the past a KJ would buy multiple copies of an original disc if he or she desired to operate multiple systems, now they simply "clone" their songs for multiple commercial systems or even their entire karaoke song libraries to start a new operation. Additionally, many KJs or operators starting in the business simply buy computer drives pre-loaded with thousands of illegally copied songs.

These practices have become so widespread that Slep-Tone has been driven nearly out of business. At its peak, the Sound Choice family of companies employed 75 individuals and produced as many as 5 new karaoke discs per month. Today, the enterprise employs only 5 individuals. Sound Choice Studios, which was responsible for production of new material, was driven out of business and the assets sold to ex-employees because the companies lost money on

---

[1] MP3 is an acronym standing for "Moving Picture Experts Group Audio Layer 3." MP3G is a far newer format than CD+G and is significantly more portable than CD+G. The Plaintiff has only recently begun distributing its karaoke tracks in this format, and only under tight contractual controls that require user registration and audits, confine possession to professional karaoke operators, include serialization of licensed discs, and prohibit file sharing under pain of forfeiture of license rights.

COMPLAINT – Page 2

every recent new karaoke disc. The most recent new disc in 2009 did not produce enough revenue even to cover the production and licensing costs associated with it—yet the songs from that disc can be found on as many as 30,000 karaoke systems around the United States. Because its primary purpose was to record new music for Karaoke and it could no longer profitably produce new music, it was shut down. In the future Sound Choice will have to subcontract to the ex-employees if/when it is able to profitably release new titles again.

For KJs, karaoke is a commercial enterprise. KJs who legitimately acquired all of their music at great cost are being forced by illicit competition to produce shows for lower and lower fees. Illegitimate competitors offer libraries of tens of thousands of songs, which would have cost $50,000 to $100,000 or more to acquire legitimately, but produce shows for one-third the rates a legitimate KJ can offer. The result is significant financial pressure on once-legitimate KJs to skirt or ignore the law and become pirates, simply to stay in business. Slep-Tone has been forced to undertake this litigation in order to ensure that it survives and continues to produce the high-quality karaoke music its fans demand and to level the playing field for the legitimate KJs.

## JURISDICTION AND VENUE

1. This is an action for trademark infringement and unfair competition arising under §§ 32 and 43 of the Trademark Act of 1946, 15 U.S.C. §§ 1114 and 1125. This Court has exclusive jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the laws of the United States.

2. This Court further has jurisdiction pursuant to 28 U.S.C § 1338(a), in that this civil action arises under an Act of Congress relating to trademarks, and, as to the Plaintiff's Lanham

Act unfair competition claim, pursuant to 28 U.S.C. § 1338(b), in that the claim is joined with a substantial and related claim under the trademark laws of the United States.

3. This Court has supplemental jurisdiction over the subject matter of the Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367(a), in that those claims are so related to the Plaintiff's federal claims that they form part of the same case or controversy.

4. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), because all of the defendants reside in this State and at least one of the defendants resides in this judicial district, and venue is proper in the Eastern Division because a substantial part of the events or omissions giving rise to the claim occurred within this division.

## **THE PLAINTIFF**

5. Plaintiff SLEP-TONE is a North Carolina corporation having its principal place of business at 14100 South Lakes Drive in Charlotte, North Carolina.

## **THE DEFENDANTS**

6. Each of the Defendants is a member of or a close associate of a business enterprise known as "Extreme Karaoke" and "Absolute Disc Jockeys", the principal business aim of which is to profit through the performance of entertainment services, particularly including karaoke entertainment services.

7. Defendant JOHN COYNE is an individual who is the owner and principal moving spirit of "Extreme Karaoke" and "Absolute Disc Jockeys" and conducts his business activities at least in Addison, IL; Buffalo Grove, IL; Chicago, IL; Glenview, IL; Highwood, IL; Morton Grove, IL; Mount Prospect, IL; Prospect Heights, IL; Rosemont, IL; and Wheeling, IL. Defendant JOHN COYNE is engaged in the business of providing karaoke entertainment, and he conducts his business at multiple venues in this State.

8. Defendant MITCH PALMER is an individual who conducts his business activities at least in Glenview, IL and Morton Grove, IL. Defendant MITCH PALMER is engaged in the business of providing karaoke entertainment, and he conducts his business at multiple venues in this State.

9. Defendant ALLEN MANDO is an individual who conducts his business activities at least in Chicago, IL. Defendant ALLEN MANDO is engaged in the business of providing karaoke entertainment, and he conducts his business at at least one venue in this State.

10. Defendant TONY GONZALEZ is an individual who conducts his business activities at least in Glenview, IL and Addison, IL. Defendant TONY GONZALEZ is engaged in the business of providing karaoke entertainment, and he conducts his business at multiple venues in this State.

11. Defendant TIM THOMAS is an individual who conducts his business activities at least in Glenview, IL. Defendant TIM THOMAS is engaged in the business of providing karaoke entertainment, and he conducts his business at at least one venue in this State.

12. Defendant RACHEL YACKLEY is an individual who conducts her business activities at least in Buffalo Grove, IL. Defendant RACHEL YACKLEY is engaged in the business of providing karaoke entertainment, and she conducts her business at at least one venue in this State.

13. Defendant ANGIE ONTHENIC is an individual who conducts her business activities at least in Glenview, IL. Defendant ANGIE ONTHENIC is engaged in the business of providing karaoke entertainment, and she conducts her business at at least one venue in this State.

14. Defendant PETER GARCIA is an individual who conducts his business activities at least in Highwood, IL. Defendant PETER GARCIA is engaged in the business of providing karaoke entertainment, and he conducts his business at at least one venue in this State

15. Defendant KENNY SEIDMAN is an individual who does business as "DJ Kenny B" and who conducts his business activities at least in Mount Prospect, IL. Defendant KENNY SEIDMAN is engaged in the business of providing karaoke entertainment, and he conducts his business at at least one venue in this State.

## BACKGROUND FACTS

16. Slep-Tone is one of the leading United States manufacturers of karaoke accompaniment tracks.

17. Slep-Tone's manufacturing process involves re-recording popular songs in the style of a particular performer, but without the lead vocals, and synchronizing the music to a display of the lyrics in a manner that gives cues to the performer as to what and when to sing.

18. Karaoke compact disc plus graphics or MP3 plus graphics recordings contain re-created arrangements of popular songs for use as accompaniment tracks.

19. Typically, the lead vocal tracks in an accompaniment track are omitted so that a karaoke participant can sing along, as though he or she were the lead singer. In other situations, the lead vocal track by a sound-alike artist might be included, and some formats allow the lead vocal to be selectively muted upon playback so that the accompaniment track may be listened to either with or without the lead vocals.

20. The "graphics" portion of a karaoke recording refers to the encoding of the recording with data to provide a contemporaneous video display of the lyrics to the song, in order to aid the performer.

21. This graphics data is also utilized to mark the accompaniment tracks with the Sound Choice trademarks and to cause the Sound Choice trademarks to be displayed upon playback.

22. Entertainers who provide karaoke services in bars, restaurants, and other venues are known as karaoke jockeys, karaoke hosts, or karaoke operators ("KJs"). The services provided by KJs typically include providing the karaoke music and equipment for playback, entertaining the assembled crowd for warm-up purposes, and organizing the karaoke show by controlling access to the stage, setting the order of performance, and operating the karaoke equipment.

23. Typically, a KJ will maintain a printed catalog of songs available for performance in order to aid participants in selecting a song to sing.

24. Legitimate KJs purchase equipment and purchase or license compact discs containing accompaniment tracks and charge for the above-mentioned karaoke services.

25. Some KJs copy the accompaniment tracks from compact discs to computer hard drives or other media, an activity known as "media-shifting."

26. Many KJs, such as some of the present Defendants, obtain, copy, share, distribute and/or sell media-shifted copies of the accompaniment tracks via pre-loaded hard drives, USB drives, CD-R's, or the Internet.

27. In many cases, media-shifting also involves converting the compact disc files to a different format, such as from CD+G format to MP3G format or WAV+G format; this is referred to as "format-shifting."

28. Both media-shifting and format-shifting involve the creation of copies of the original materials stored on the compact discs.

29. SLEP-TONE does not authorize media-shifting or format-shifting of its accompaniment tracks for any commercial purpose. SLEP-TONE does, however, tolerate media-shifting and format-shifting under very specific conditions.

30. SLEP-TONE's conditions for tolerance of media-shifting and format-shifting include, without limitation, that (a) that each media-shifted or format-shifted track must have originated from an original, authentic compact disc; (b) that the tracks from the original, authentic compact disc be shifted to one, and only one, alternative medium at a time; (c) if a track is shifted to another medium, the entire track must be shifted (i.e., no "chopping"); (d) that the KJ maintain ownership and possession of the original, authentic compact disc for the entire time that the media-shifted or format-shifted tracks are in existence; (e) that the original, authentic compact disc not be used for any commercial purpose while its content has been shifted; (f) if the karaoke host discontinues possession of either the authorized original medium or the alternative medium, the associated tracks must be removed from the alternative medium; and (g) that the KJ notify SLEP-TONE that he or she intends to conduct or has conducted a media-shift or format-shift, and submits to a verification of adherence to SLEP-TONE's policy.

31. Media-shifting or format-shifting that occurs outside the conditions of tolerance described above is entirely without authorization or tolerance.

COMPLAINT – Page 8

32. Based upon investigation of their activities, the present Defendants are in possession of unauthorized media-shifted and format-shifted copies of karaoke accompaniment tracks that have been marked falsely with SLEP-TONE's federally registered trademarks.

33. Each of the Defendants has used media-shifted and/or format-shifted karaoke accompaniment tracks marked with the SLEP-TONE's registered trademarks for commercial purposes.

34. Defendants display SLEP-TONE's registered trademarks to their customers or potential customers for purposes of advertising to their customers the quality and superiority that is associated with SLEP-TONE products. In addition to displaying the marks for advertisement purposes, the Defendants advertise that they use SOUND CHOICE® products by identifying SOUND CHOICE® as manufacturers of tracks listed in song lists and other publications.

35. Defendants display the registered marks to attract more customers and retain loyal customers, all of who recognize the quality and superiority of SLEP-TONE products. Defendants directly benefit from the advertisement of SLEP-TONE's registered trademarks.

36. Without exception, the Defendants' media-shifting activities have been undertaken outside the conditions of tolerance described above.

37. A karaoke accompaniment track that exists outside the conditions of tolerance described above and that has been marked with SLEP-TONE's federally registered trademarks is a counterfeit.

38. SLEP-TONE pays statutory and negotiated royalties to the owners of copyright in the underlying musical works for their activities in legitimately creating, copying, distributing, and selling compact discs containing karaoke accompaniment tracks.

39. Persons, including the Defendants, who illegitimately obtain, copy, share, distribute, and/or sell media-shifted copies of the Plaintiff's accompaniment tracks do not pay royalties to the owners of copyright in the underlying musical works.

40. SLEP-TONE has spent millions of dollars building and maintaining studios, hiring artists, building a distribution facility, paying royalties to copyright owners, building a company that is capable of reliably producing high-quality karaoke versions of current and historical musical hits, and building a brand that is one of the pre-eminent brands in the industry.

41. The widespread creation, distribution, and commercial use of counterfeit copies of SLEP-TONE's karaoke discs, including by these Defendants, has denied SLEP-TONE the benefit of its investments.

42. These counterfeits include SLEP-TONE's registered trademarks, such that to the consumers of the illegitimate KJs' services, the counterfeits are virtually indistinguishable from genuine SOUND CHOICE® materials.

43. For each of the several recent releases of new karaoke music by SLEP-TONE, dozens of illegitimate copies of the contents of the disc have been created, on average, for each legitimate copy sold. SLEP-TONE and its licensors have lost a considerable amount of money due to this widespread piracy.

44. Such widespread illegal copying of music has been made possible by improving and ever cheaper computer technology and memory devices and the easy distribution of digital content over the Internet.

45. Widespread pirating of songs has contributed to the loss of more than seventy jobs at the Plaintiff's location in Charlotte, North Carolina, as well as several consecutive years of operating losses, as revenues do not cover fixed costs.

46. Legitimate KJs spend thousands of dollars acquiring SLEP-TONE's accompaniment tracks, an irreducible overhead cost that must be recovered over a significant number of engagements.

47. Illegitimate KJs, including these Defendants, have an unfair advantage over legitimate KJs, because the illegitimate KJs are able to provide karaoke services with a considerably lower overhead cost and significantly more songs through the pirating of SLEP-TONE's tracks.

48. Piracy therefore unfairly increases the profits of illegitimate KJs and unfairly decreases the profits of legitimate KJs, a condition that pressures legitimate KJs to either commit piracy instead of doing business with SLEP-TONE or lose their shows to KJs offering more songs at cheaper prices to the same venues.

49. Because of piracy, it is nearly impossible for legitimate KJs to compete against illegal KJs, who are able to provide less expensive karaoke services and a greater number of tracks due to their lower overhead costs.

## **THE RIGHTS OF THE PLAINTIFF**

50. Plaintiff SLEP-TONE is the owner of U.S. Trademark Registrations No. 1,923,448 and No. 4,099,045, both for the mark SOUND CHOICE.

51. Plaintiff SLEP-TONE is also the owner of U.S. Trademark Registrations No. 2,000,725 and No. 4,099,052, both for the following mark:

[Sound Choice mark]

52. Plaintiff SLEP-TONE has, for the entire time its marks ("the Sound Choice Marks") have been federally registered, provided the public, including the Defendants, with notice of its federal registrations through the consistent display of the symbol ® with its marks as used.

53. Slep-Tone is the owner of distinctive and protectable trade dress associated with its graphical displays ("the Trade Dress"). This distinctive and protectable trade dress includes, at a minimum (a) the use of a particular typeface, style, and visual arrangement in displaying the lyrics; (b) the use of particular colors to display lyrics, namely white lyrics changing to violet lyrics, set against a black background; and (c) the use of a particular style in displaying entry cues for singers, namely a series of vanishing rectangles to indicate the cue.

54. The Trade Dress has been in use continuously and substantially exclusively by Slep-Tone since the onset of production on compact discs more than 20 years ago.

55. The individual and collected elements of the Trade Dress have acquired secondary meaning as an indicator of Slep-Tone as the source, effectively functioning as a visual trademark.

56. The Trade Dress serves to distinguish Slep-Tone's tracks from the tracks of its competitors, such that persons who are even minimally frequent consumers of karaoke

entertainment services such as those provided by these Defendants are capable of identifying a particular karaoke track as originating with Slep-Tone simply by examining the Trade Dress, whether or not the Sound Choice Marks are also displayed.

57. The elements of the Trade Dress represent specific design choices by Slep-Tone; they are but one of many ways to convey the information necessary to permit a karaoke singer to be appropriately supported in his or her performance.

58. Slep-Tone's many competitors are not required to use any element of the Trade Dress to accomplish the cueing function, and indeed all of Slep-Tone's known competitors are known to use other trade dress in accomplishing the cueing function.

## **INVESTIGATION OF THE DEFENDANTS' ACTIVITIES**

59. SLEP-TONE has conducted an extensive investigation of the operations of each of the Defendants, including by attending one or more public karaoke shows put on by each of the Defendants.

60. Each of the Defendants has possessed, used, or authorized the use and display of unauthorized counterfeit goods bearing the Sound Choice Marks, or has provided, advertised, or authorized from the provision of services in connection with the Sound Choice Marks without authorization or tolerance from—or indeed notice to—SLEP-TONE.

61. Each of the Defendants has provided services in connection with the Sound Choice Marks, and has advertised the Defendant's provision of or availability to provide karaoke services in connection with which the Sound Choice Marks have been used.

62. Each of the Defendants has knowingly benefited from the possession, use, and display of unauthorized counterfeit goods bearing the Sound Choice Marks.

63. The activities of each Defendant are not isolated or sporadic occurrences, but are instead regular activities undertaken over a long period of time.

64. Each of the Defendants' acts of infringement is of a commercial nature, in that they engaged in the acts with the transfer of money from one party to another as the principal motivation for providing the services.

65. Each of the Defendants employs a library of karaoke music that contains unauthorized counterfeit goods bearing the Sound Choice Marks, including media-shifted karaoke tracks.

66. None of the Defendants have obtained the permission of SLEP-TONE to conduct media-shifting of SLEP-TONE's music from original discs to an alternative medium, such as a computer hard drive.

67. None of the Defendants have notified SLEP-TONE of their intent to conduct media-shifting of SLEP-TONE's music for commercial purposes.

68. None of the Defendants have submitted to and passed an audit of their karaoke systems for the purposes of verifying their compliance with SLEP-TONE's media-shifting policy.

69. Each of the Defendants knew, or should have known under the circumstances, that they were obtaining and using counterfeit karaoke tracks.

## DAMAGES

70. The Defendants' unauthorized use of the Sound Choice Marks has damaged the Plaintiff both individually and in the aggregate.

71. In order to build a large library of SLEP-TONE's accompaniment tracks, a legitimate KJ could expect to spend approximately $25,000 for each karaoke system upon which that

library would be used. For a comprehensive library of SLEP-TONE's accompaniment tracks, that figure would rise to $40,000 or more.

72. Individually, each of the Defendants has damaged the Plaintiff in an amount of at least $25,000 for each karaoke system the Defendant operates. This figure is based upon the estimated minimum cost of acquiring, through legitimate means, a single set of copies of the material that each of the Defendants has pirated.

73. Upon information and belief, in the aggregate, by exerting illegitimate and unfair pressure upon the market for karaoke services in this area through the use of pirated material belonging to the Plaintiff, the Defendants have jointly cost the Plaintiff in excess of $125,000 in revenue from the legitimate sources crowded out of the market by the Defendants' piracy.

**FIRST CLAIM FOR RELIEF**
**TRADEMARK AND/OR TRADE DRESS INFRINGEMENT**

74. Plaintiff SLEP-TONE realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein, and incorporates them herein by reference.

75. Each of the Defendants used, or authorized or directly benefited from the use of, a reproduction, counterfeit, or copy of the Sound Choice Marks, or of the Trade Dress, or both, in connection with the provision of services including karaoke services, by manufacturing or acquiring the reproduction, counterfeit, or copy of the Sound Choice Marks, or of the Trade Dress, or both and by displaying the reproduction, counterfeit, or copy of the Sound Choice Marks, or of the Trade Dress, or both during the provision of those services.

76. The Defendants' use of the Sound Choice Marks, or of the Trade Dress, or both was "in commerce" within the meaning of the Trademark Act of 1946 as amended.

77. Plaintiff SLEP-TONE did not license any of the Defendants to manufacture or acquire reproductions, counterfeits, or copies, or to use the Sound Choice Marks, or the Trade Dress, or both, in connection with the provision of their services.

78. The Defendants' use of the Sound Choice Marks, or of the Trade Dress, or both is likely to cause confusion, or to cause mistake, or to deceive the Defendants' customers and patrons into believing that the Defendants' services are being provided with the authorization of the Plaintiff and that the Defendants music libraries contain bona fide Sound Choice accompaniment tracks.

79. The acts of each of the Defendants were willful.

80. The Plaintiff has been damaged by infringing activities of each of the Defendants.

81. Unless enjoined by the Court, the Defendants' infringing activities as described above will continue unabated and will continue to cause harm to the Plaintiff.

## SECOND CLAIM FOR RELIEF
## UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)

82. Plaintiff SLEP-TONE realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein, and incorporates them herein by reference.

83. On each occasion when they caused a SLEP-TONE accompaniment track to be played during a karaoke show, the Defendants displayed the Sound Choice Marks, or the Trade Dress, or both in connection with the Defendants' karaoke services.

84. The display of the Sound Choice Marks, the Trade Dress, or both is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that SLEP-TONE sponsored or approved the Defendants' services and commercial activities.

85. The display of the Sound Choice Marks, the Trade Dress, or both is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by SLEP-TONE and purchased by the Defendants.

86. The Defendants' use of the Sound Choice Marks, the Trade Dress, or both in this fashion would have inured to the benefit of the Plaintiff if the Defendants had legitimately acquired genuine Sound Choice discs instead of counterfeiting them or acquiring the counterfeit goods, in that the Plaintiff would have received revenue from such sales.

87. Because SLEP-TONE has been denied this revenue, it has been damaged by the Defendants' uses.

88. The display of these false designations of origin is likely to cause confusion, or to cause mistake or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the pirated tracks are legitimate, authorized, and authentic materials that the Defendant acquired in a legitimate manner.

89. The display of the false designations of origin is also likely to cause confusion or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by those manufacturers and purchased by the Defendants.

90. The Defendants' use of the false designations of origin in this fashion damages the Plaintiff by enabling the Defendants to provide karaoke services at a lower cost than persons who acquire those materials legitimately, including the Plaintiff's legitimate customers.

91. The consequential denial of revenue from a legitimate market for the Plaintiff's customers' services prevents the Plaintiff's customers from making purchases of material from the Plaintiff and is thus a denial of revenue to the Plaintiff.

92. Because Slep-Tone has been denied this revenue, it has been damaged by the Defendant's false designations of origin.

93. Unless enjoined by the Court, the Defendants' unfair competition activities as described above will continue unabated and will continue to cause harm to the Plaintiff.

### THIRD CLAIM FOR RELIEF
### UNDER THE ILLINOIS DECEPTIVE TRADE PRACTICES ACT

94. Plaintiff SLEP-TONE realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein, and incorporates them herein by reference.

95. Each Defendant has engaged in acts of infringement of the Sound Choice Marks and the Trade Dress, in derogation of SLEP-TONE's common-law and statutory rights in those marks.

96. Each Defendant's acts of infringement occurred during the conduct of trade or commerce.

97. Each Defendant's acts of infringement constitute unfair or deceptive acts or practices within the meaning of 815 ILCS 510/1 *et seq*.

98. As a direct and proximate result of each Defendant's acts of infringement, SLEP-TONE has suffered a pecuniary loss, to wit: the loss of revenue associated with sales or distribution of compact discs to karaoke jockeys, commensurate with the demand for the contents of those discs, which revenue would have been received but for the Defendants' acts in creating or acquiring counterfeits of SLEP-TONE's accompaniment tracks.

99. As such, SLEP-TONE has been damaged and is likely to be further damaged by a deceptive trade practice of each Defendant within the meaning of 815 ILCS 510/3.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff SLEP-TONE prays for judgment against each of the Defendants severally and that the Court:

A. Find that each of the Defendants has committed acts of infringement, including but not limited to counterfeiting, of the federally registered Sound Choice Marks, of the Trade Dress, or of both;

B. Find that each of the Defendants has engaged in unfair competition against Plaintiff SLEP-TONE in violation of 15 U.S.C. § 1125(a).

C. Find that each of the Defendants has committed unfair and deceptive trade practices under Illinois law and in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act;

D. Enter judgment against each of the Defendants and in favor of SLEP-TONE;

E. Find the that Defendants' activities were in all respects conducted willfully and for profit;

F. Award to SLEP-TONE the Defendants' profits and the damages sustained by SLEP-TONE because of the Defendants' conduct in infringing the Sound Choice Marks, the Trade Dress, or both, or, in the alternative, statutory damages per trademark infringed by counterfeiting in an amount up to two million dollars per mark infringed, per Defendant and in any event in an amount not less than $25,000 for each Karaoke system operated by the Defendants;

G. Award to SLEP-TONE the Defendants' profits and the damages sustained by SLEP-TONE because of the Defendants' acts of unfair competition under 15 U.S.C. § 1125(a)

in an amount not less than $125,000, jointly and severally upon the collective conduct of the Defendants;

H. Award to SLEP-TONE treble, punitive, or otherwise enhanced damages, as available, for the Defendants' acts of willful infringement;

I. Order all computer disks, drives, or other media belonging to any of the Defendants, which media contain illegal counterfeits of the Sound Choice Marks, or of the Trade Dress, to be delivered up for destruction;

J. Grant SLEP-TONE preliminary and permanent injunctive relief against further infringement of the Sound Choice Marks and the Trade Dress by the Defendants;

K. Award SLEP-TONE its costs of suit and attorney's fees, to the extent not awarded above; and

L. Grant SLEP-TONE such other and further relief as justice may require.

Respectfully submitted this the 27th day of March 2013.

                                SLEP-TONE ENTERTAINMENT CORP.

                                By__/s/Brian J. Laurenzo_____
                                   Attorney for Plaintiff
                                   Slep-Tone Entertainment Corporation

| | |
|---|---|
| Brian J. Laurenzo, # 6197605 | Mark Gross, #6197703 |
| BRICK GENTRY P.C. | GROSS & BOYLE, LLC |
| 6701 Westown Parkway, Suite 100 | 15 Salt Creek Lane, Suite 207 |
| West Des Moines, IA 50266 | Hinsdale, IL 60521 |
| Tel:   515-274-1450 | Tel:   630-887-7373 |
| Fax:  515-274-1488 | Fax:  630-887-7171 |
| Attorney for Plaintiff | Attorney for Plaintiff |
| Slep-Tone Entertainment Corporation | Slep-Tone Entertainment Corporation |