UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SLEP-TONE ENTERTAINMENT CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | 13 C 2298 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| JOHN COYNE d/b/a EXTREME KARAOKE and ABSOLUTE DISC JOCKEYS, MITCH PALMER, ALLEN MANDO, TONY GONZALEZ, TIM THOMAS, RACHEL YACKLEY, ANGIE ONTHENIC, PETER GARCIA, and KENNY SEIDMAN d/b/a DJ KENNY B, | ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Slep-Tone Entertainment Corporation alleges in this suit that John Coyne, Mitch Palmer, Allen Mando, Tony Gonzalez, Tim Thomas, Rachel Yackley, Angie Onthenic, Peter Garcia, and Kenny Seidmam engaged in the unauthorized use and display of Slep-Tone's product bearing its Sound Choice trademark, in violation of §§ 32 and 43 of the Lanham Act, 15 U.S.C. §§ 1114, 1125, and the Illinois Deceptive Trade Practices Act ("IDTPA"), 815 ILCS 510/1 *et seq*. Doc. 1. The claims against Thomas, Gonzalez, Palmer, and Onthenic have been voluntarily dismissed. Docs. 7, 34. Coyne, Mando, Garcia, Yackley, and Seidman (collectively, "Defendants") have moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). Docs. 15, 24, 31. The motion is denied.

**Background**

In considering the motion to dismiss, the court assumes the truth of the complaint's factual allegations, though not its legal conclusions. *See Munson v. Gaetz*, 673 F.3d 630, 632 (7th Cir. 2012). The court must consider "documents attached to the complaint, documents that

1

are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Slep-Tone's brief opposing dismissal, so long as those facts "are consistent with the pleadings." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). The following facts are stated as favorably to Slep-Tone as these materials allow. *See Gomez v. Randle*, 680 F.3d 859, 864 (7th Cir. 2012).

Slep-Tone is a leading manufacturer of karaoke accompaniment tracks, which guide karaoke participants as they sing along to songs. Doc. 1 at ¶¶ 16, 19. Slep-Tone produces its accompaniment tracks by re-recording popular songs, omitting or fading out the lead vocals, and adding lyrics and visual cues that allow the karaoke participant to know when and what to sing. *Id*. at ¶ 17. Since the company's founding twenty-eight years ago, Slep-Tone has sold its accompaniment tracks under the name "Sound Choice," which is presented in slanted font against the backdrop of the five lines of a music staff. *Id*. at 1, ¶¶ 50-51. Slep-Tone owns U.S. Trademark Registrations No. 1,923,448 and No. 4,099,045 for the Sound Choice name, and U.S. Trademark Registrations No. 2,000,725 and No. 4,099,052 for the Sound Choice mark. *Ibid*. Slep-Tone pays royalties to the copyright owners of the underlying musical works in the accompaniment tracks. *Id*. at ¶ 38. Slep-Tone's accompaniment tracks have become "the staple of almost every karaoke show in the country." *Id*. at 1.

Accompaniment tracks are recorded in one of two encoded formats: compact disks plus graphics (CD+G), or MP3s plus graphics (MP3G). *Id*. at ¶ 18. The graphics portion of the recording consists of contemporaneous video display of the lyrics synchronized to the song. *Id*. at ¶ 20. Slep-Tone's graphical display is distinctive in its presentation and includes "(a) the use of a particular typeface, style, and visual arrangement in displaying the lyrics; (b) the use of particular colors to display lyrics, namely white lyrics changing to violet lyrics, set against a

black background; and (c) the use of a particular style in displaying entry cues for singers, namely a series of vanishing rectangles to indicate the cue." *Id.* at ¶ 53. The display, used for more than twenty years, has become another way for the public to identify Slep-Tone as the producer of the accompaniment track. *Id.* at ¶¶ 54-56.

Slep-Tone's accompaniment tracks are sold to entertainers, known as karaoke jockeys, who are hired by bars and restaurants. *Id.* at ¶ 22. Karaoke jockeys are paid to provide karaoke music and equipment, warm up the crowd, set the order of karaoke performances, and operate the karaoke equipment. *Ibid.* They usually provide participants with a catalog of songs available for performance as well. *Id.* at ¶ 23. Karaoke jockeys must purchase or license the music they offer in the form of CDs containing accompaniment tracks. *Id.* at ¶ 24.

Some karaoke jockeys engage in "media-shifting," in which they copy the contents of the CD to their computer hard drive or other media. *Id.* at ¶ 26. They may also engage in "format-shifting," which involves copying the files on the CD and then converting them into a different format, such as from CD+G to MP3G. *Id.* at ¶ 27. Slep-Tone does not authorize or tolerate media-shifting or format-shifting of its accompaniment tracks for any commercial purpose, unless it occurs under the following conditions:

> (a) … each media-shifted or format-shifted track must have originated from an original, authentic compact disc; (b) … the tracks from the original, authentic compact disc [must] be shifted to one, and only one, alternative medium at a time; (c) if a track is shifted to another medium, the entire track must be shifted (i.e. no "chopping"); (d) … the [karaoke jockey must] maintain ownership and possession of the original, authentic compact disc for the entire time that the media-shifted or format-shifted tracks are in existence; (e) … the original, authentic compact disc [must] not be used for any commercial purpose while its content has been shifted; (f) if the karaoke host discontinues possession of either the authorized original medium or the alternative medium, the associated tracks must be removed from the alternative medium; and (g) … the [karaoke jockey must] notify SLEP-TONE that he or she intends to conduct or has conducted a media-shift or format-shift, and submits to a verification of adherence to SLEP-TONE's policy.

3

*Id.* at ¶ 30.

Defendants are karaoke jockeys in the business of providing karaoke entertainment. *Id.* at ¶¶ 7-15. Defendants are affiliated, either as members or close associates, with a karaoke entertainment company known as "Extreme Karaoke" and "Absolute Disc Jockeys," which is owned by Coyne. *Id.* at ¶ 6. After attending one or more public karaoke shows performed by Defendants and conducting an extensive investigation of their karaoke operations, Slep-Tone found that they possess unauthorized media-shifted and format-shifted copies of karaoke accompaniment tracks, all of which bear Slep-Tone's Sound Choice trademarks. *Id.* at ¶ 32.

Defendants have displayed Slep-Tone's Sound Choice trademark to their customers and potential customers for purposes of advertising "the quality and superiority that is associated with SLEP-TONE products." *Id.* at ¶ 34. Defendants also have advertised their usage of Sound Choice tracks by identifying Sound Choice as the manufacturer of the tracks listed in their song booklet and other publications. *Ibid.* The media-shifted copies of Slep-Tone's accompaniment tracks appear "virtually indistinguishable" from authorized Slep-Tone tracks. *Id.* at ¶ 42. Slep-Tone did not give Defendants permission to shift its tracks from the original disc to an alternative medium, and was not notified by Defendants of their intent to conduct media-shifting for commercial purposes. *Id.* at ¶¶ 36, 66-67.

Defendants' use of media-shifted karaoke tracks allows them to provide karaoke services with a considerably lower overhead cost than other karaoke jockeys, who must pay the full price to acquire their Slep-Tone accompaniment tracks in various formats. *Id.* at ¶¶ 46-47. A large library of Slep-Tone accompaniment tracks would cost a karaoke jockey at least $25,000. *Id.* at ¶ 71. Defendants' ability to offer cheaper karaoke services and a larger number of tracks makes them more attractive to venues, to the detriment of karaoke jockeys who legitimately acquired

Slep-Tone tracks and are unable to offer competitively priced shows. *Id*. at ¶ 48. Slep-Tone has spent "millions of dollars building and maintaining studios, hiring artists, building a distribution facility, [and] paying royalties to copyright owners," *id*. at ¶ 40, and it has lost a significant amount of revenue due to the widespread creation, distribution, and commercial use of unauthorized copies, *id*. at ¶ 43.

## Discussion

Slep-Tone alleges that Defendants' use of unauthorized, media-shifted Slep-Tone tracks bearing the Sound Choice mark constitutes trademark infringement and unfair competition under the Lanham Act, *see* 15 U.S.C. §§ 1114, 1125, and deceptive trade practices under the IDTPA. The motion to dismiss seeks dismissal of all three claims. Doc. 15. Defendants also seek dismissal of a trademark counterfeiting claim, *id*. at 19, but Slep-Tone denies bringing such a claim, Doc. 17 at 9. so counterfeiting need not be discussed.

Slep-Tone's three claims arise from the same allegedly infringing conduct, and Defendants' arguments for dismissal are the essentially the same for all three claims. This stands to reason, as "federal and state laws regarding trademarks and related claims of unfair competition are substantially congruent." *TMT N. Am., Inc. v. Magic Touch GmbH*, 124 F.3d 876, 881 (7th Cir. 1997) (internal quotation marks omitted); *see also McGraw-Edison Co. v. Walt Disney Prods.*, 787 F.2d 1163, 1174 (7th Cir. 1986) (holding that "[u]nder the [IDTPA,] a defendant is liable only if the plaintiff can establish a likelihood of confusion between the parties' products," and noting that "'[l]ikelihood of confusion' has the same meaning in unfair competition cases under the [IDTPA] as it has in [trademark] infringement cases [under the Lanham Act]") (internal quotation marks omitted); *id*. at 1167 ("15 U.S.C. §§ 1114, 1125 … require that a plaintiff demonstrate that the defendant has created a likelihood of confusion as to

5

the origin of his product"); *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1288 n.2 (9th Cir. 1992) ("elements of infringement and unfair competition claims [under the Lanham Act] are essentially the same; the rulings stand or fall together"). Thus, analysis of all three claims may proceed simultaneously, and if the federal trademark claim survives dismissal, so do the two other claims.

Defendants assert three grounds for dismissing the federal trademark claim: (1) Slep-Tone has failed to plausibly allege the "use in commerce" and "likelihood of confusion" elements of the claim; (2) the doctrine of nominative fair use bars the claim; and (3) *Dastar Corporation v. Twentieth Century Fox Film Corporation*, 539 U.S. 23 (2003), bars the claim.

I. **Whether The Complaint Adequately Alleges Use In Commerce And Likelihood of Confusion**

    A. **Use In Commerce**

Defendants contend that the complaint does not sufficiently allege that they used the Sound Choice marks in commerce. Doc. 15 at 6. The Lanham Act defines "use in commerce" in relevant part as follows:

> The term "use in commerce" means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. For purposes of this chapter, a mark shall be deemed to be in use in commerce—
> …
>
> (2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce.

15 U.S.C. § 1127; *see Central Mfg., Inc. v. Brett*, 492 F.3d 876, 881 (7th Cir. 2007) (holding that "[a]n action for trademark infringement can only succeed if, among other things, the plaintiff owns the mark," and although "[r]egistration provides prima facie evidence of ownership …, [u]ltimately, it is not the fact of registration that matters so much as the use of the mark in

commerce"). The Supreme Court has held that the term "use in commerce" should be construed broadly "[i]n the light of the broad jurisdictional grant in the Lanham Act." *Steele v. Bulova Watch Co.*, 344 U.S. 280, 286 (1952); *see also Scotch Whiskey Ass'n v. Barton Distilling Co.*, 489 F.2d 809, 812 (7th Cir. 1973) (noting that *Steele* "upheld a broad concept of 'commerce'").

In *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 130 (2d Cir. 2009), the Second Circuit held that "use in commerce" was adequately pleaded in a complaint analogous to Slep-Tone's. The plaintiff, Rescuecom, whose name was trademarked, was a national computer service franchising company that conducted a substantial amount of business over the internet. *Id*. at 126. Rescuecom advertised over the internet using Google's AdWords program, through which advertisers may purchase keywords. *Ibid*. Rescuecom filed a Lanham Act trademark infringement suit against Google, alleging that Google's AdWords had been recommending the Rescuecom trademark to Rescuecom's competitors as a keyword for purchase, thereby deceiving internet searchers into believing that competitors were endorsed by or affiliated with Rescuecom. *Ibid*. Citing the complaint's allegation that Google had displayed and sold the mark to its advertising customers, the Second Circuit held that "Google's utilization of Rescuecom's mark fits literally within the terms specified by 15 U.S.C. § 1127." *Id*. at 129 ("Google uses and sells Rescuecom's mark 'in the sale … of [Google's advertising] services … rendered in commerce").

Defendants' alleged conduct likewise maps onto the definition of "use in commerce" of § 1127. Slep-Tone alleges that Defendants displayed Slep-Tone's registered trademarks to existing and potential customers during their public karaoke shows and through song booklets to "advertis[e] to their customers the quality and superiority that is associated with Slep-Tone products." Doc. 1 at ¶¶ 32, 34. Slep-Tone further alleges that "Defendants display the registered marks to attract more customers and retain loyal customers." *Id*. at ¶ 35. Just as Google

7

displayed Rescuecom's mark in the course of selling Google's advertising services, Defendants displayed the Sound Choice mark as they sold their karaoke jockeying services. Defendants' argument that "at no time does Plaintiff assert that the Defendants are in any way selling his product" misses the point. Doc. 23 at 3. Section 1127 provides that "a mark shall be deemed to be in use in commerce … on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce." 15 U.S.C. § 1127. Nowhere does it specify that the advertised "services" must be those of the plaintiff. Indeed, Google displayed Rescuecom's mark not in the course of selling Rescuecom's computer services, but in the course of selling Google's own advertising services. It follows that Slep-Tone has sufficiently pleaded the "used in commerce" requirement of its infringement claim.

Defendants next contend that "[t]he Complaint has failed to allege specific facts showing that *any one of the defendants* has used the SOUND CHOICE Marks in interstate commerce"— in other words, that Slep-Tone has improperly lumped the actions of the various defendants. Doc. 15 at 9 (emphasis added). This argument fails. It is true that "[l]iability is personal," that Rule 8(a) requires the complaint to inform "[e]ach defendant … what he or she did that is asserted to be wrongful," and that "[a] contention … without any details about who did what … is inadequate." *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013). But the complaint satisfies these requirements, alleging that "[e]ach of the Defendants has possessed, used, or authorized the use and display of unauthorized counterfeit goods bearing the Sound Choice Marks" and that "[e]ach of the Defendants has provided services in connection with the Sound Choice Marks, and has advertised … the provision of or availability to provide karaoke services in connection with which the Sound Choice Marks have been used." Doc. 1 at ¶¶ 59-61. It is not impermissible lumping to allege that each defendant, on his or her own, engaged in

precisely the same misconduct. *See Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 422 (S.D.N.Y. 2010) (rejecting the argument that "grouping all of the Citco Defendants together as 'Citco' in the [complaint] without articulating what alleged acts are attributable to each defendant constitutes impermissible 'lumping,'" reasoning that "[w]hen Plaintiffs do make certain allegations against the Citco Defendants as a whole, Plaintiffs assert a factual basis for doing so," and noting that "Plaintiffs clearly define Citco … to include each of the Citco Defendants").

  **B. Likelihood of Confusion**

Defendants next argue that the complaint does not sufficiently allege a likelihood of confusion. Doc. 15 at 9. "To prevail on a Lanham Act claim, a plaintiff must establish that (1) her mark is protectable, and (2) the defendant's use of the mark is likely to cause confusion among consumers." *Packman v. Chi. Tribune Co.*, 267 F.3d 628, 638 (7th Cir. 2001). "[W]hether consumers are likely to be confused about the origin of a company's products is a question of fact" governed by several factors: "(1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) whether actual confusion exists; and (7) whether the defendant intended to 'palm off' his product as that of the plaintiff." *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 677-78 (7th Cir. 2001). Although "[n]o single factor is dispositive and courts may assign varying weights to each of the factors depending on the facts presented," "[i]n many cases, … three of the factors are likely to be particularly important: the similarity of the marks, the defendant's intent, and actual confusion." *Id*. at 678. That said, "there is no hard and fast requirement that all three of these factors must weigh in the plaintiff's favor in order to find that a likelihood of confusion exists,"

9

as "the district court must give appropriate weight to the factors that are particularly important based on the facts of each case." *Id*. at 686-87 (internal quotation marks omitted).

Because the "likelihood of confusion test is a fact-intensive analysis," it "ordinarily does not lend itself to a motion to dismiss." *Merck & Co., Inc. v. Mediplan Health Consulting, Inc.*, 425 F. Supp. 2d 402, 412 (S.D.N.Y. 2006); *see also Vulcan Golf, LLC v. Google Inc.*, 552 F. Supp. 2d 752, 769 (N.D. Ill. 2008) (noting that the likelihood of confusion test "is a fact-specific inquiry best left for decision after discovery"). Thus, the court's role at the motion to dismiss stage is limited to assessing whether Slep-Tone has pleaded facts that plausibly could result in a successful outcome on the likelihood of confusion element of its claim.

The complaint alleges facts regarding the first factor, similarity of the marks, that could favor a finding of a likelihood of confusion. Slep-Tone alleges that Defendants' media-shifted copies of Slep-Tone's accompaniment tracks, which contain the Sound Choice mark, appear "virtually indistinguishable" from authorized Slep-Tone tracks. Doc. 1 at ¶ 42. The pleaded facts plausibly give rise to the inference that the products are similar, which is the second factor. The Seventh Circuit has explained that "because the rights of an owner of a registered trademark extend to any goods that might be, in the minds of consumers, 'related,' … the more accurate inquiry is whether the public is likely to attribute the products and services to a single source." *CAE, Inc.*, 267 F.3d at 679. "'Closely related' products are those that would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner." *Ibid*. (internal quotation marks omitted). Thus, Defendants' argument that confusion is unlikely because the products are sold to different purchasers in different "channels of trade" is not conclusive. Doc. 15 at 9. Karaoke accompaniment tracks are a necessary component of a karaoke jockey's entertainment service.

10

Drawing inferences in Slep-Tone's favor, it is plausible that consumers of Defendants' karaoke jockeying services could reasonably conclude from displays bearing the Sound Choice mark and song booklets advertising Sound Choice tracks that Defendants' show was affiliated with, connected with, or sponsored by Slep-Tone. *See CAE, Inc.*, 267 F.3d at 680 (holding that "consumers reasonably could conclude that [defendant] Clean Air's products and services are affiliated or associated with [plaintiff] CAE, Inc." where Clean Air has developed software and components that can be used as an add-on or upgrade for a software system designed by CAE).

The complaint does not appear to allege facts regarding the third factor, area and manner of concurrent use. But the complaint does allege facts regarding the fourth factor, the degree of care likely to be exercised by consumers, which looks at whether "both parties' potential consumers" could be confused as to the source of the mark, taking into consideration the consumers' sophistication. *Id.* at 682-83. Even where "many of the parties' customers are sophisticated and decide to buy only after extensive negotiations, these customers' technical sophistication about their particular industry does not equate to trademark sophistication." *Id.* at 683. Slep-Tone's and Defendants' primary consumers—karaoke jockeys and venues, respectively—are sophisticated and likely familiar with the karaoke industry. However, given the close relationship between the parties' products and services, and the fact that they operate within the same industry, these consumers may be just as susceptible as a layperson to mistakenly attribute an unauthorized Sound Choice mark to Slep-Tone. *See id.* at 683-84 (finding a likelihood of confusion despite the sophisticated consumer base of CAE and Clean Air given the close relationship between the companies' products and services, as the companies "offer some of the same basic technology and, in some instances, serve the same companies and the same industries").

11

The complaint also alleges facts that could support the presence of the fifth factor, strength of the plaintiff's mark. "The 'strength' of a trademark refers to the mark's distinctiveness, meaning its propensity to identify the products or services sold as emanating from a particular source." *Id*. at 684. In *CAE, Inc.*, the Seventh Circuit held that CAE had a "strong, distinctive mark," citing "(1) [CAE's] 40-year use of the mark in the United States; (2) hundreds of millions of dollars of annual sales in the United States; (3) extensive expenditures to promote its products and services in connection with the CAE mark; (4) use of the letters in the names of its subsidiaries and divisions; and (5) registration of several federal trademarks that feature the letter combination." *Id*. at 685. Slep-Tone does not have subsidiaries or divisions, and nor does it allege that it registered trademarks other than the "Sound Choice" mark. However, Slep-Tone has been using the Sound Choice mark since the company's founding twenty-eight years ago and has experienced some measure of financial success, as its accompaniment tracks allegedly have become "a staple of almost every karaoke show in the country." Doc. 1 at 1. And like CAE, Slep-Tone has alleged that it spent "millions of dollars" maintaining its business and promoting its products under the Sound Choice mark. *Id*. at ¶ 40.

The complaint does not appear to alleged facts concerning the sixth factor, actual confusion. Contrary to Defendants' submission, this is not conclusive. "Although evidence of actual confusion, if available, is entitled to substantial weight in the likelihood of confusion analysis, this evidence is not required to prove that a likelihood of confusion exists." *CAE, Inc.*, 267 F.3d at 685 (citations omitted). Likewise, the complaint does not appear to allege facts concerning the seventh factor, whether the defendant intended to "palm off" his product as that of the plaintiff. The complaint alleges only that "Defendants knew, or should have known under the circumstances, that they were obtaining and using counterfeit karaoke tracks" in the course of

12

conducting shows and advertising that they were using Sound Choice tracks. Doc. 1 at ¶ 69. Regardless, "proof of intent to deceive or to confuse is not necessary to prove trademark infringement," and a weak or nonexistent showing of this factor does not foreclose finding a likelihood of confusion. *See CAE, Inc.*, 267 F.3d at 686 (citing 3 J. Thomas McCarthy, *Trademarks and Unfair Competition* § 23:107, at 23-248 to 23-251 (4th ed. 2011)).

In sum, although the complaint does not allege facts pertinent to three of the seven factors, it has pleaded enough to plausibly suggest that Slep-Tone could prevail on the likelihood of confusion test. *See id*. at 687 (affirming the district court's holding of a likelihood of confusion despite negligible evidence of actual confusion or intent); *Ty, Inc.*, 237 F.3d at 901-02; *Illinois Tool Works, Inc. v. Chester Bros. Machined Prods., Inc.*, 2006 WL 2191982, at * 2-3 (N.D. Ill. July 27, 2006) (holding that a likelihood of confusion was sufficiently pleaded at the Rule 12(b)(6) stage where the plaintiff "allege[d] that defendant's use of the orange-colored mark is likely to lead consumers to believe that defendant's products originate from or are sponsored, endorsed or authorized by plaintiff," even though the defendant's advertisement was not an exact replica of the plaintiff's trademark, reasoning that "[t]he Court is … not persuaded that plaintiff must allege every factor relevant to likelihood of confusion to satisfy that element").

**II. Whether The Nominative Fair Use Doctrine Bars Slep-Tone's Trademark Infringement Claim**

Defendants next assert that Slep-Tone's trademark infringement claim is barred by the doctrine of nominative fair use, which they characterize as "refer[ring] to a defendant's use of plaintiff's trademark to describe or identify the plaintiff's product." Doc. 15 at 11. The Seventh Circuit has not addressed the nominative fair use defense. According to the Ninth Circuit, "[c]lassic fair use is that in which the alleged infringer has used the trademark holder's mark *only*

13

to describe his own product, *and not at all to describe the trademark holder's product. …*, [whereas] nominative fair use occurs when the alleged infringer uses the trademark holder's mark to describe the trademark holder's product, *even if the alleged infringer's ultimate goal is to describe his own product.*" *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 328 F.3d 1061, 1071-72 (9th Cir. 2003) (citations, internal quotation marks, and brackets omitted), *vacated on other grounds*, 543 U.S. 111 (2004). "To successfully assert the nominative fair use defense, the alleged infringer must show that: 1) the product in question is not readily identifiable without use of the trademark; 2) only so much of the mark is used as reasonably necessary to identify the product; and 3) the user of the mark did nothing that would suggest sponsorship by the trademark holder." *Id*. at 1072. "When analyzing nominative fair use, it is not necessary to address likelihood of confusion because the nominative fair use analysis replaces the likelihood of confusion analysis," while "when the classic fair use defense is raised, it is still necessary to analyze likelihood of confusion." *Ibid*.

It does not appear that any circuit has joined the Ninth Circuit's recognition of the nominative fair use defense. The Supreme Court declined to address the issue, *see KP Permanent Make-Up, Inc.*, 543 U.S. at 115 n.3, and the Third and Sixth Circuits have rejected the defense, *see Century 21 Real Estate Corp. v. Lendingtree, Inc.*, 425 F.3d 211, 220-21 (3d Cir. 2005); *PACCAR Inc. v. TeleScan Technologies, L.L.C.*, 319 F.3d 243, 256 (6th Cir. 2003). It is unnecessary to join the fray here, as the defense would fail at the Rule 12(b)(6) stage even if it existed. Settled precedent holds that "complaints need not allege facts that tend to defeat affirmative defenses." *U.S. Gypsum Co. v. Indiana Gas Co., Inc.*, 350 F.3d 623, 628 (7th Cir. 2003); *see also Richards v. Mitcheff*, 696 F.3d 635, 637-38 (7th Cir. 2012). "Only when the plaintiff pleads itself out of court—that is, admits all the ingredients of an impenetrable

defense—may a complaint that otherwise states a claim be dismissed under Rule 12(b)(6)." *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004); *see also Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 941-42 (7th Cir. 2012). Because Slep-Tone is not obligated to allege facts defeating an affirmative defense, and because the complaint does not admit all the ingredients of the nominative fair use defense, the defense does not provide a basis for a Rule 12(b)(6) dismissal.

### III.    Whether *Dastar* Defeats the Trademark Infringement Claim

Finally, Defendants contend that *Dastar Corp. v. Twentieth Century Fox Film Corp.*, *supra*, defeats Slep-Tone's trademark infringement claim. Doc. 15 at 15. According to Defendants, *Dastar* "holds that the Lanham Act does not protect against confusion as to the identity of the author of any idea, concept, or communication (*i.e.* copyrightable expression)," which means that "Slep-Tone impermissibly seeks to redress the unlawful copying and distribution of its music and lyrics—claims that are properly brought under the copyright[] laws—through a trademark infringement action." *Ibid*. This argument misreads *Dastar*.

The plaintiff in *Dastar*, Twentieth Century Fox, acquired exclusive television rights to a book titled *Crusade in Europe*. 539 U.S. at 25-26. Fox then commissioned the production of a television series, also called *Crusade in Europe*, based on the book. *Id*. at 26. Fox's copyright in the television series expired in 1977, leaving it to the public domain. *Ibid*. In 1988, Fox reacquired the copyright in the television series and granted two companies exclusive rights to restore, repackage, and distribute the *Crusade in Europe* video series. *Ibid*. In 1995, the defendant, Dastar Corporation, released a video series entitled *World War II Campaigns in Europe*. *Ibid*. Dastar made the videos by purchasing tapes of the original version of the *Crusade*

15

*in Europe* television series—which were in the public domain—and editing and repackaging them. *Ibid*. Nowhere in its videos did Dastar credit the *Crusade in Europe* television series.

      The question presented was whether Dastar's failure to properly credit the *Crusade in Europe* television series violated § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which provides a federal remedy against anyone who uses in commerce "a false designation of origin" that is "likely to cause confusion … as to the origin … of his or her goods." 539 U.S. at 27. The Supreme Court held that there was no violation, reasoning that "the Lanham Act does not prevent unaccredited copying of uncopyrighted work." *Id*. at 23. The Court refused to read the term "origin" in § 43(a) expansively to require attribution of *uncopyrighted* materials, noting that "[w]ithout a copyrighted work as the basepoint, the word 'origin' has no discernible limits," as the true "original" creator of the material used in the *Campaigns in Europe* and *Crusade in Europe* videos would not be Fox, but perhaps the unidentified "Newsreel Pool Cameramen." *Id*. at 35. The Court determined that "origin of goods" instead "refers to the producer of the tangible goods that are offered for sale [the *Campaigns in Europe* videos sold by Dastar], and not to the author of any idea, concept, or communication embodied in those goods." *Id*. at 37. The Court explained:

> Federal trademark law has no necessary relation to invention or discovery, but rather, by preventing competitors from copying a source-identifying mark, reduces the customer's costs of shopping and making purchasing decisions and helps assure a producer that it (and not an imitating competitor) will reap the financial reputation-related rewards associated with a desirable product.

*Id*. at 34 (internal quotation marks, citations, and brackets omitted). In that vein, the Court suggested that there would have been a Lanham Act violation where, "for example, … Dastar had simply copied the television series as Crusade in Europe and sold it as Crusade in Europe without changing the title or packaging (including the original credits to Fox)." *Id*. at 36

16

(internal quotation marks and brackets omitted); *see also Eastland Music Grp., LLC v. Lionsgate Entm't, Inc.*, 707 F.3d 869, 872 (7th Cir. 2013) ("*Dastar* tells us not to use trademark law to achieve what copyright law forbids. Only a confusion about origin supports a trademark claim, and 'origin' for this purpose means the 'producer of the tangible product sold in the marketplace.'"); *Bretford Mfg., Inc. v. Smith Sys. Mfg. Corp.*, 419 F.3d 576, 581 (7th Cir. 2005) ("The right question, *Dastar* holds, is whether the consumer knows who has produced the finished product.").

The holding of *Dastar* is inapposite here, as Slep-Tone has not alleged that Defendants engaged in the "unaccredited copying of uncopyrighted work." The underlying musical works that Slep-Tone modified and repackaged into accompaniment tracks are duly copyrighted, and Slep-Tone does not allege that Defendants failed to credit the original musicians and composers. Rather, Slep-Tone challenges Defendants' copying and usage of the Sound Choice mark without obtaining the requisite authorization from Slep-Tone.

*Dastar* actually reinforces Slep-Tone's decision to file a trademark claim rather than a copyright claim. Like Dastar, Slep-Tone is the "producer of the tangible goods that are offered for sale," and thus the "origin of goods" for purposes of the Lanham Act. *Dastar*, 539 U.S. at 37. Consistent with § 1125(a), Slep-Tone alleges that Defendants copied, without alteration, Slep-Tone's "source-identifying mark" and used it in connection with their karaoke jockeying services, which is "likely to cause confusion … as to the origin … of [their] goods." *Id*. at 34. Slep-Tone is trying to stop Defendants from unfairly "reap[ing] the financial, reputation-related rewards associated with a desirable product," *ibid*. (internal quotation marks omitted)—precisely the behavior that the Lanham Act seeks to prevent. *See Slep-Tone Entm't Corp. v. Elwood Enters., Inc.*, 2014 WL 1612891, at *5 (N.D. Ill. Apr. 21, 2014) (holding that *Dastar* is

distinguishable because "[t]here, the defendant took the plaintiff's product and, after altering it, put the defendant's own mark on it," whereas "[h]ere, [the defendant] contracted with [karaoke jockeys] who pass off inferior versions of Slep-Tone's products by pasting Slep-Tone's own mark on them"); *Slep-Tone Entm't Corp. v. Shenanigans Lounge*, 2013 WL 1768444, at *3 (D. Or. Feb. 22, 2013) (same, reasoning that Slep-Tone "is not alleging confusion as to the identity of the author of the karaoke tracks in dispute," and "[r]ather, … alleges that its trademark has been affixed to a product that defendants are using to generate customers and revenue—a product that is not plaintiff's product but a different 'media-shifted' or 'format-shifted' version of the product"); *Slep-Tone Entm't Corp. v. Arrowood*, 2011 WL 4482082, at *3 (S.D. Ohio Sept. 26, 2011) (same, noting that Slep-Tone based its claims "on the confusion caused by the display of the Sound Choice marks").

## Conclusion

For the foregoing reasons, Defendants' motion to dismiss is denied. Defendants shall answer the complaint by May 22, 2014.

May 8, 2014

United States District Judge