UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SLEP-TONE ENTERTAINMENT CORPORATION, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | 13 C 2298 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| JOHN COYNE d/b/a EXTREME KARAOKE and ABSOLUTE DISC JOCKEYS, ALLEN MONDO, RACHEL YACKLEY, PETER GARCIA, and KENNY SEIDMAN d/b/a DJ KENNY B, | ) ) ) ) ) | |
| Defendants/Counter-Plaintiffs. | ) | |

### MEMORANDUM OPINION AND ORDER

Slep-Tone Entertainment Corporation brought this suit against John Coyne, Allen Mondo, Rachel Yackley, Peter Garcia, and Kenny Seidman, alleging that they engaged in the unauthorized use and display of Slep-Tone's product bearing its Sound Choice trademark, in violation of §§ 32 and 43 of the Lanham Act, 15 U.S.C. §§ 1114, 1125, and the Illinois Deceptive Trade Practices Act, 815 ILCS 510/1 *et seq*. Doc. 1. The court denied Defendants' motion under Federal Rule of Civil Procedure 12(b)(6) to dismiss the complaint; familiarity with that opinion is assumed. Docs. 51-52 (reported at __ F. Supp. 2d __, 2014 WL 1848735 (N.D. Ill. May 8, 2014)). Defendants answered and asserted ten counterclaims. Doc. 53. Slep-Tone has moved to dismiss nine of the counterclaims under Rule 12(b)(6). Docs. 57, 61. The motion is granted, though Defendants will be given an opportunity to replead.

### Background

In considering Slep-Tone's motion to dismiss, the court assumes the truth of the counterclaims' factual allegations, though not their legal conclusions. *See Munson v. Gaetz*, 673 F.3d 630, 632 (7th Cir. 2012). The court must also consider "documents attached to the

1

[counterclaims], documents that are critical to the [counterclaims] and referred to in [them], and information that is subject to proper judicial notice," along with additional facts set forth in Defendants' brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). The facts are stated as favorably to Defendants, the non-movants, as these materials allow. *See Gomez v. Randle*, 680 F.3d 859, 864 (7th Cir. 2012).

Slep-Tone manufactures karaoke accompaniment tracks, which guide participants as they sing along to songs. Doc. 53 at p. 33, ¶ 7. Slep-Tone sells the tracks to entertainers, known as karaoke jockeys, who are hired by bars and restaurants to provide karaoke music and equipment, warm up the crowd, set the order of karaoke performances, and operate the karaoke equipment. *Id*. at p. 7, ¶ 22. Karaoke jockeys usually provide participants with a catalog of songs available for performance. *Id*. at p. 8, ¶ 23.

Since its founding twenty-eight years ago, Slep-Tone has sold its accompaniment tracks under the name "Sound Choice," which is presented in slanted font against the backdrop of the five lines of a music staff. *Id*. at p. 15, ¶¶ 50-51. In 2011, Slep-Tone filed for U.S. Trademark Registration Nos. 4,099,045 and 4,099,052 for the Sound Choice name and mark; the United States Patent and Trademark Office ("USPTO") approved the application in early 2010. *Id*. at p. 34, ¶¶ 12-15.

The following year, Slep-Tone sent letters to Defendants, who are affiliated with a karaoke entertainment company owned by Coyne, and to venues where Defendants provide karaoke services. *Id.* at p. 35, ¶¶ 20-21. The letters claimed that Defendants were infringing Slep-Tone's trademark by using unauthorized tracks that displayed the Sound Choice mark during their performances, and threatened to sue unless Defendants purchased a new set of

authorized tracks and allowed Slep-Tone to audit their digital media at any time. *Id.* at p. 35, ¶¶ 20-22. The letters also threatened to sue the karaoke venues unless they hired Slep-Tone-approved karaoke jockeys or required their existing jockeys to submit to audits. *Id.* at p. 35, ¶¶ 23-24. As noted above, Slep-Tone ultimately did sue Defendants for infringement. Doc. 1.

## Discussion

Defendants' ten counterclaims fall into two broad categories. Doc. 53 at pp. 35-45. Counts I through V attack the scope and validity of the Sound Choice mark. Counts VI through X are premised to varying degrees on the charge that this lawsuit is part of an "orchestrated litigation plan [by Slep-Tone] to defraud and otherwise extort money from legitimate karaoke operators." *Id.* at p. 34, ¶ 19.

### I. Trademark Counterclaims

Count I seeks a declaratory judgment that the Sound Choice mark is invalid and unenforceable. Doc. 53 at pp. 35-36, ¶¶ 26-30. Counts III and IV seek to cancel the mark pursuant to 15 U.S.C. § 1064. *Id.* at pp. 38-40, ¶¶ 39-54. Count V seeks damages under 15 U.S.C. § 1120 for fraudulent procurement of registration. *Id.* at pp. 40-41, ¶¶ 55-58. (Slep-Tone does not move to dismiss Count II, which seeks a declaratory judgment that Defendants did not infringe the mark, and which is a mirror image of Slep-Tone's infringement claim. *Id.* at pp. 36-37, ¶¶ 31-38.)

At bottom, Counts I and III-V are premised on Defendants' charge that Slep-Tone 2011 application defrauded the USPTO by falsely claiming that the Sound Choice mark had been used in commerce. *See generally Resorts of Pinehurst, Inc. v. Pinehurst Nat'l Corp.*, 148 F.3d 417, 420 (4th Cir. 1998) ("A mark shall be canceled if its registration was fraudulently obtained."); 15 U.S.C. § 1120 ("Any person who shall procure registration in the Patent and Trademark Office

3

of a mark by a false or fraudulent declaration or representation, oral or in writing, or by any false means, shall be liable in a civil action by any person injured thereby for any damages sustained in consequence thereof."); 15 U.S.C. § 1064(3) (allowing for cancellation of a mark due to, among other things, fraudulent registration). "Use in commerce" is one of requirements for trademark registration. *See* 15 U.S.C. § 1051(a)(3)(C); 37 C.F.R. § 2.34(a). "Use in commerce" means "means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark"; a mark is used in commerce on goods when it is "placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto," and on services "when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services." 15 U.S.C. § 1127.

  In its trademark application, which Slep-Tone attached to its brief, Slep-Tone represented that the Sound Choice mark had been "first use[d] in commerce … as early as 07/21/2010." Doc. 61-1 at 2. The application is a matter of public record, *see Rockland Expo., Inc. v. Alliance of Auto. Serv. Providers of N.J.*, 894 F. Supp. 2d 288, 301 n.6 (S.D.N.Y 2012); *Tecumseh Poultry LLC v. Perdue Holdings, Inc.*, 2012 WL 3018255, at *6 n.4 (D. Neb. July 24, 2012), and therefore is an appropriate subject for judicial notice, *see Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997). In addition, the application is critical to the counterclaims and referred to in them, and thus may be considered on a Rule 12(b)(6) motion for that reason as well. *See Geinosky*, 675 F.3d at 745 n.1.

  The counterclaims allege that Slep-Tone's representation regarding the use in commerce of the mark "was false because [neither] Slep nor any of its agents were using the mark for the

4

purpose of conducting karaoke shows nor have they ever been in the business of conducting entertainment karaoke shows." Doc. 53 at pp. 38, 39, ¶¶ 42, 50. The premise of this allegation—that use in commerce means use only by the applicant—is incorrect, as use in commerce also encompasses use by a "related company." *See* 15 U.S.C. § 1055 ("Where a … mark sought to be registered is or may be used legitimately by related companies, such use shall inure to the benefit of the registrant or applicant for registration."); 37 C.F.R. § 2.38(a) ("If the first use of the mark was by a predecessor in title or by a related company …, and the use inures to the benefit of the applicant, the dates of first use … may be asserted with a statement that first use was by the predecessor in title or by the related company, as appropriate."). "Related company" means "any person whose use of a mark is controlled by the owner of the mark with respect to the nature and quality of the goods or services on or in connection with which the mark is used." 15 U.S.C. § 1127. Slep-Tone contends that its application's assertion of use in commerce meant "use in commerce through licensees (karaoke jockeys and hosts)," who displayed the Sound Choice mark in the course of their performances, and "not through its own use." Doc. 61 at 5.

Defendants do not dispute that, under 15 U.S.C. § 1055, use by a controlled licensee can establish use in commerce for purposes of trademark registration. *See Doeblers' Pa. Hybrids, Inc., v. Doebler*, 442 F.3d 812, 823 (3d Cir. 2006) ("Use of a trademark need not always be made directly by the trademark owner and is often made 'with the permission' of the owner via a licensing agreement. Indeed, sometimes the *only* use of a mark is through a licensee."); *Turner v. HMH Pub. Co.*, 380 F.2d 224, 229 (5th Cir. 1967) ("In our view … the Lanham Act definitely contemplates that a trade or services mark may be acquired through its use by controlled licensees, even though the registrant itself may not have used the mark."); 3 J. Thomas

McCarthy, *McCarthy on Trademarks and Unfair Competition* § 18:46 (4th ed. 2006) ("Ownership rights in a trademark or service mark can be acquired and maintained through the use of the mark by a controlled licensee even when the first and only use of the mark was made, and is being made, by the licensee."). At a hearing on Slep-Tone's motion to dismiss, though, Defendants contended that Slep-Tone may not invoke § 1055 because it never exercised the requisite level of control over its licensees. That theory does not appear in the counterclaims or in Defendants' opposition brief. By the time Defendants finally raised that theory, after Slep-Tone filed its reply brief, it was too late. Although *Geinosky* allows a non-movant on a Rule 12(b)(6) motion to buttress its claims with factual assertions in its brief opposing dismissal, *see* 675 F.3d at 745 n.1, assertions first made at oral argument are a bridge too far. Thus, the failure-to-control argument has been forfeited, at least for purposes of this motion.

The argument that Defendants did properly assert, and that the court will consider, is that Slep-Tone's application fraudulently failed to disclose that it was relying on use by a related company. It is true that the regulations provide that if a mark "is not in fact being used by the applicant but is being used by one or more related companies whose use inures to the benefit of the applicant under [§ 1055], such facts must be indicated in the application." 37 C.F.R. § 2.38(b). But Slep-Tone's application complied with that provision.

As an initial matter, it is not clear that an applicant's failure to disclose that a mark was used by a related company, standing alone, would constitute fraud on the USPTO. "Fraud in procuring a trademark registration … occurs when an applicant knowingly makes false, material representations of fact in connection with his application." *In re Bose Corp.*, 580 F.3d 1240, 1243 (Fed. Cir. 2009); *see also Money Store v. Harriscorp*Fin., Inc.*, 689 F.2d 666, 670 (7th Cir. 1982) ("Fraud will be deemed to exist only when there is a deliberate attempt to mislead the

6

Patent Office into registering the mark."). "To constitute 'fraud' the knowing misrepresentation to the PTO must be 'material' in the sense that but for the misrepresentation, the federal registration either would not or should not have issued. … [I]t is probably the law that in the trademark context, a material misrepresentation arises only if the registration should not have issued if the truth were known to the examiner." 6 McCarthy, *supra*, at § 31:67; *see also San Juan Prods., Inc. v. San Juan Pools of Kan., Inc.*, 849 F.2d 468, 473 (10th Cir. 1988). However, as just noted, Defendants forfeited (for purposes of this motion) any argument that Slep-Tone did not adequately control use of its mark by its licensees. And had Slep-Tone expressly stated in its application that it was relying on the related-company doctrine, the registration still would have issued. Accordingly, Slep-Tone's alleged omission might not have been material in the first place. *Cf. Pony Exp. Courier Corp. of Am. v. Pony Exp. Delivery Serv.*, 872 F.2d 317, 319 (9th Cir. 1989) ("The claim of a date of first use is not a material allegation as long as the first use in fact proceeded the date. … There is no dispute that Baker's use preceded the application date in 1972.").

There is no need to definitely resolve the question, however, because Slep-Tone's application did adequately disclose that its mark was used by its licensee. As required by 37 C.F.R. § 2.56(a), the company attached two specimens to its application, both photos showing the use in commerce of the Sound Choice mark. Doc. 61-1 at 8-9. The application expressly stated that the specimens were "digital photographs of a performance of the services *by a licensee* and showing the mark being displayed during the performance." *Id.* at 2 (emphasis added). Here is a reproduction of the relevant portion of the application:

7

| GOODS AND/OR SERVICES AND BASIS INFORMATION | |
|---|---|
| *INTERNATIONAL CLASS | 041 |
| IDENTIFICATION | Conducting entertainment exhibitions in the nature of **karaoke shows** |
| *FILING BASIS | SECTION 1(a) |
| FIRST USE ANYWHERE DATE | At least as early as 07/01/1987 |
| FIRST USE IN COMMERCE DATE | At least as early as 07/21/2010 |
| SPECIMEN FILE NAME(S) | \\TICRS\EXPORT11\IMAGEOUT 11\853\645\85364555\xml1\ FTK0003.JPG |
| | \\TICRS\EXPORT11\IMAGEOUT 11\853\645\85364555\xml1\ FTK0004.JPG |
| SPECIMEN DESCRIPTION | digital photographs of a performance of the services by a licensee and showing the mark being displayed during the performance |

Undaunted, Defendants argue that the description does not satisfy 37 C.F.R. § 2.38 because "the language of the [Lanham] Act … uses the term 'related company,' … [i]t is the term, 'related company' that must be used in order to determine whether or not Plaintiff properly used the mark in commerce." Doc. 68 at 6. Defendants' contention cannot be reconciled with 37 C.F.R. § 2.38(b) or the USPTO's Trademark Manual of Examination Procedure ("TMEP"), which details the procedures that USPTO examining attorneys must follow when considering an application. Although the TMEP "is not established law," it "does represent the PTO's established policy … that is entitled to our respect." *In re Pennington Seed, Inc.*, 466 F.3d 1053, 1059 (Fed. Cir. 2006). Thus, if Slep-Tone's application complied with the TMEP, it cannot be said to have defrauded the USPTO.

The edition of the TMEP in force at the time of Slep-Tone's application states that "[i]f the applicant is not itself using the mark in commerce but the mark is being used by one or more

related companies whose use inures to the applicant's benefit …, this must be stated in the application or allegation of use." TMEP § 901.05 (7th ed. 2010), available at http://tess2.uspto.gov/tmdb/tmep_7ed/. The TMEP proceeds to say that applicants need not use the term "related company" and instead can use "equivalent explanatory wording." *Id*. § 1201.03(a) ("In an application under § 1(a) of the Trademark Act, the applicant should state in the body of the application that the applicant has adopted and is using the mark through its related company (or equivalent explanatory wording).") (emphasis deleted).

Slep-Tone's application disclosed use by a "licensee," and it is true that a licensee must be a controlled licensee to qualify as a related company. *See* 15 U.S.C. § 1127 (defining "related company"); *Turner*, 380 F.2d at 229; *Original Rex, LLC v. Beautiful Brands Int'l, LLC*, 792 F. Supp. 2d 1242, 1255-56 (W.D. Okla. 2011). But the TMEP expressly provides that the USPTO does not require an applicant to state whether and how it controls its licensees. *See* TMEP § 1201.03(f) ("If the application indicates that use of the mark is pursuant to a license or franchise agreement, and the record contains nothing that contradicts the assertion of ownership by the applicant …, the examining attorney will not inquire about the relationship between the applicant and the related company (i.e., the licensee or franchisee)."); *ibid.* ("In general, where the application states that a mark is used by a licensee or franchisee, the USPTO does not require an explanation of how the applicant controls the use."). Accordingly, by stating that the Sound Choice mark was used by its licensee, Slep-Tone provided all the information that an examiner would need to make a determination about the application—or at least to determine whether to inquire further. Slep-Tone therefore cannot possibly be said to have defrauded the USPTO.

Besides contending that only the words "related company" will satisfy an applicant's disclosure requirement, Defendants offer no reason why Slep-Tone's disclosure was insufficient.

9

The remainder of Defendants' submission on the disclosure issue consists of nearly two pages of unattributed quotations from *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 366-67 (2d Cir. 1959). Doc. 68 at 7-8. *Dawn Donut* is about the difference for trademark purposes between controlled and uncontrolled licenses; it has nothing to do with the disclosures an applicant must make to the USPTO.

In sum, because Defendants have not plausibly alleged that Slep-Tone failed to satisfy its disclosure obligations or made fraudulent statements in its trademark application, Defendants' claims for a declaratory judgment of invalidity, cancellation of the mark, and damages for fraudulent procurement are dismissed. In so holding, the court acknowledges that *Slep-Tone Entertainment Corp. v. Teddy O'Brian's, Inc.*, 2014 WL 4783048 (N.D. Ill. Sept. 24, 2014), reached a different conclusion in declining to dismiss identical trademark-fraud counterclaims against Slep-Tone. *See also Slep-Tone Entm't Corp. v. Kalamata, Inc.*, 2014 WL 7235164, at *3-4 (N.D. Ill. Dec. 18, 2014) (relying on *Teddy O'Brian's*). *Teddy O'Brian's* reasons that "[i]t is not clear what language 'states,' 'discloses,' or 'equivalently explains' that a mark is being used by a related company, where such language must appear in an application, or whether this record contains all of the information the USPTO reviewed in connection with plaintiff's application." *Id.* at *2 (alterations omitted). According to the TMEP, however, an applicant must disclose "in the body of the application" that a mark was used by a related company, TMEP §§ 901.05, 1201.03(a), and need only state that the use was by a licensee, *id*. § 1201.03(f). Slep-Tone's application complied with those requirements.

## II.    Litigation Misconduct Counterclaims

Counts VI through X concern Slep-Tone's pre-litigation and litigation conduct. Specifically, Defendants claim that Slep-Tone defamed them (Count VI); violated the Sherman

and Clayton Acts, 15 U.S.C. §§ 1-7, 12-27 (Count VII); and committed the state law torts of abuse of process, common law fraud, and tortious interference with contract (Counts VIII-X). Doc. 53 at pp. 41-45, ¶¶ 59-100.

The defamation and tortious interference counterclaims may be quickly dispatched. Slep-Tone argues that the defamation counterclaim fails because Defendants do not identify any false statements that Slep-Tone made about Defendants and because any such statements would be absolutely privileged. Doc. 61 at 14-15, citing, *e.g.*, *Lucien v. Preiner*, 967 F.2d 1166, 1168 (7th Cir. 1992) ("Lucien's failure to allege anything more than that the defendant lied in her letter, without even stating what those lies are, is simply not enough to state a claim for declaratory or injunctive relief."); *Restatement (Second) of Torts* § 587 (1977) ("A party to private litigation … is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding … if the matter has some relation to the proceeding."). And Slep-Tone argues that the tortious interference counterclaim fails because Defendants have not suggested that it "acted with a desire to harm which was unrelated to the interest [it] was presumably seeking to protect by bringing about the contract breach." Doc. 61 at 15, citing *Capital Options Investments, Inc. v. Goldberg Bros. Commodities, Inc.*, 958 F.2d 186, 189 (7th Cir. 1992) (Illinois law). Both arguments are plausible, and yet both are met with total silence, as Defendants' brief does not even mention, let alone attempt to defend, the defamation and tortious interference counterclaims.

"If [a court is] given plausible reasons for dismissing a complaint, [the court is] not going to do the plaintiff's research and try to discover whether there might be something to say against the defendant's reasoning." *Kirksey v. R.J. Reynolds Tobacco Co.,* 168 F.3d 1039, 1041 (7th Cir. 1999). It follows that a plaintiff's failure to respond to a Rule 12(b)(6) motion giving plausible

11

reasons for dismissal warrants dismissal of the claims in question. *See ibid*. ("In effect the plaintiff was defaulted for refusing to respond to the motion to dismiss. And rightly so."); *Phongsa v. JPMorgan Chase Bank, N.A.*, 2014 WL 2510203, at *2 (N.D. Ill. June 3, 2014) (citing cases). Counts VI and X are accordingly dismissed. *See Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("Longstanding under our case law is the rule that a person waives an argument by failing to make it before the district court. We apply that rule where a party fails to develop arguments related to a discrete issue, and we also apply that rule where a litigant effectively abandons the litigation by not responding to alleged deficiencies in a motion to dismiss.") (citations omitted); *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1335 (7th Cir. 1995) (holding that "when presented with a motion to dismiss, the non-moving party must proffer some legal basis to support his cause of action," and cautioning that "[t]he federal courts will not invent legal arguments for litigants").

Count VII, which alleges that Slep-Tone violated federal antitrust law, also fails to state a claim. The Seventh Circuit has observed that antitrust allegations usually "will require more detail, both to give the opposing party notice of what the case is all about and to show how … the dots should be connected." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 405 (7th Cir. 2010). Defendants' antitrust counterclaim sorely lacks specifics. Defendants allege only that Slep-Tone attempted to intimidate venue owners into hiring approved karaoke jockeys; that Slep-Tone's owner publicly stated that "he would be happy to split the market share of karaoke throughout the U.S." and that his company was bringing lawsuits to drive sales; and that Slep-Tone's actions "hinder trade and represent unfair competition among those persons providing karaoke services or selling karaoke tracks." Doc. 53 at p. 42, ¶¶ 66-71. Seeing as far more detailed antitrust

allegations were held insufficient in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554 (2007), it is doubtful that Defendants' barebones allegations pass muster.

There is no need to pursue that point here, for even if Defendants' antitrust allegations satisfied *Swanson* and *Twombly*, they still would not state a viable claim. Defendants invoke § 1 of the Sherman Act, which prohibits any "contract, combination … or conspiracy, in restraint of trade or commerce," 15 U.S.C. § 1, but they do not allege any concerted activity whatsoever. This is fatal to their § 1 theory. As the Supreme Court has explained: "Even where a single firm's restraints directly affect prices and have the same economic effect as concerted action might have, there can be no liability under § 1 in the absence of agreement." *Fisher v. City of Berkeley*, 475 U.S. 260, 266 (1986); *see also Sanderson v. Culligan Int'l Co.*, 415 F.3d 620, 622 (7th Cir. 2005) ("Sanderson's [§ 1] antitrust claim … fails at the threshold because Sanderson does not contend … that Culligan has conspired with other producers to set price or output").

Defendants' opposition brief does not mention 15 U.S.C. § 2, but to the extent they mean to allege a § 2 violation, that theory fails as well. A party may not be held liable under § 2, which prohibits monopolization and attempted monopolization, "absent proof of a dangerous probability that [the party] would monopolize a particular market and specific intent to monopolize." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993). Because Defendants do not allege that Slep-Tone either possessed monopoly power or that its actions created a dangerous probability of monopolization of a relevant market, any § 2 claim cannot get off the ground. *See Sanderson*, 415 F.3d at 622 ("Recast under § 2 [Sanderson's claim] would fare no better, because Sanderson does not contend that Culligan possesses monopoly power or that bad-mouthing Magnatech's products creates a dangerous probability of monopolization.").

Although Defendants allege that Slep-Tone violated the entire Clayton Act, Doc. 53 at p. 42, ¶ 65, their opposition brief focuses only on 15 U.S.C. § 13(a), which codifies § 2(a) of the Robinson-Patman Act. Doc. 68 at 12-14. That provision outlaws price discrimination, which occurs when a producer charges purchasers different prices for the same commodity with the effect of harming competition. *See Dynegy Marketing & Trade v. Multiut Corp.*, 648 F.3d 506, 521 (7th Cir. 2011) ("Section 2(a) of the Robinson-Patman Act makes it illegal to discriminate in price when an injury to competition is the consequence."). But Defendants do not allege anything about Slep-Tone's pricing, let alone that Slep-Tone sold the same thing at different prices. *See New Albany Tractor, Inc. v. Louisville Tractor, Inc.*, 650 F.3d 1046, 1051 (6th Cir. 2011) ("To make out a claim under Robinson-Patman, the plaintiff must allege: (1) two or more contemporaneous sales by the same seller; (2) at different prices; (3) of commodities of like grade and quality; (4) the discrimination had the requisite anticompetitive effect; and (5) the discrimination caused injury to the plaintiff."). The antitrust claims are accordingly dismissed. *See Teddy O'Brian's, Inc.*, 2014 WL 4783048, at *3-4.

Count VIII, the abuse of process counterclaim, alleges that Slep-Tone has brought groundless litigation solely to "harass or otherwise annoy and coerce" Defendants "into the purchase of Slep's products." Doc. 53 at p. 43, ¶ 82. The elements of abuse of process under Illinois law are: "(1) [the] existence of an ulterior motive or purpose, and (2) some act in the use of legal process not proper in the regular prosecution of the proceedings." *Podolsky v. Alma Energy Corp.*, 143 F.3d 364, 372 (7th Cir. 1998). "Because the tort of abuse of process is not favored under Illinois law, the elements must be strictly construed." *Neurosurgery & Spine Surgery, S.C. v. Goldman*, 790 N.E.2d 925, 929-30 (Ill. App. 2003). Consistent with this strict approach, "[t]he word 'process' has been given its literal meaning": "[p]rocess is issued by the

14

court[] under its official seal and must be distinguished from pleadings, which are created and filed by the litigants." *Commerce Bank, N.A. v. Plotkin*, 627 N.E.2d 746, 748 (Ill. App. 1994); *see also Cmty. Nat. Bank in Monmouth v. McCrery*, 509 N.E.2d 122, 124 (Ill. App. 1987); *Doyle v. Shlensky*, 458 N.E.2d 1120, 1128 (Ill. App. 1983).

Defendants' counterclaim alleges not the use—let alone the misuse—of any "process" issued by this court, but only that Slep-Tone brought a groundless suit simply to harass them into purchasing Slep-Tone's products. Doc. 53 at ¶¶ 74-82. Because "the settled law of Illinois [holds] that mere institution of a suit or proceeding, even with a malicious intent or motive, does not itself constitute an abuse of process," *Withall v. Capitol Fed. Savings of Am.*, 508 N.E.2d 363, 368 (Ill. App. 1987); *see also Neurosurgery & Spine Surgery*, 790 N.E.2d at 930, Count VIII is dismissed. *See Evans v. West*, 935 F.2d 922, 923 (7th Cir. 1991) (rejecting an abuse of process claim where the plaintiff alleged that the defendant "call[ed] the police and sign[ed] a [false] criminal trespass complaint"); *Rubloff Dev. Grp., Inc. v. SuperValu, Inc.*, 863 F. Supp. 2d 732, 748 (N.D. Ill. 2012) (holding that allegations saying "nothing in terms of a process issued by the court" do not state an abuse of process claim); *Motorola, Inc. v. Lemko Corp.*, 2010 WL 960348, at *3 (N.D. Ill. Mar. 15, 2010) (holding that the mere allegation that the defendant had filed suit to intimidate the plaintiff did not state an abuse of process claim).

This leaves Count IX, the common law fraud counterclaim. "Under Illinois law … the elements of common law fraud are: (1) a false statement of material fact; (2) by one who knows or believes it to be false; (3) made with the intent to induce action by another in reliance on the statement; (4) action by the other in reliance on the truthfulness of the statement; and (5) injury to the other resulting from that reliance." *Athey Prods. Corp. v. Harris Bank Roselle*, 89 F.3d 430, 434 (7th Cir. 1996). A fraud plaintiff in federal court must comply with Rule 9(b), which

provides that "[i]n alleging fraud …, a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "The circumstances of fraud … include the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 668 (7th Cir. 2008) (internal quotation marks omitted); *see also Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 441-42 (7th Cir. 2011). "This ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011).

     The common law fraud counterclaim does not satisfy Rule 9(b). Its most particularized allegation—the one on which Defendants' brief focuses, Doc. 68 at 9—is that Slep-Tone sold Defendants "disc[s] containing karaoke tracks under the premise that [Slep-Tone] held the license and that the tracks were being legally distributed," but that Slep-Tone "did not hold the licenses and has otherwise sold any licenses that [Slep-Tone] was in possession of." Doc. 53 at p. 43, ¶¶ 84-85. Defendants further allege that Slep-Tone "sold discs to [Defendants] without a licensing agreement of any kind and then attempted to manipulate [Defendants] into separate contracts based upon violations of a licensing agreement that was nonexistent." *Id.* at p. 44, ¶ 89. These allegations lack the "who, what, when, where, and how" required by Rule 9(b), which warrants dismissal of the fraud counterclaim. *See AnchorBank*, 649 F.3d at 615; *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 730 (7th Cir. 1998) ("These conclusory allegations fail to specify the time, place and content of any of the misrepresentations attributed to these defendants and therefore fall short of the particularity demanded by Rule 9(b).").

16

**Conclusion**

For the foregoing reasons, Slep-Tone's motion to dismiss is granted. Counts I and III-X of the counterclaims are dismissed. Defendants have sought leave to amend, Doc. 68 at 15, so the dismissal is without prejudice. *See Bogie v. Rosenberg*, 705 F.3d 603, 608 (7th Cir. 2013) ("When a complaint fails to state a claim for relief, the plaintiff should ordinarily be given an opportunity, at least upon request, to amend the complaint to correct the problem if possible."); *Bausch v. Stryker Corp.*, 630 F.3d 546, 562 (7th Cir. 2010) ("As a general matter, Rule 15 ordinarily requires that leave to amend be granted at least once when there is a potentially curable problem with the complaint or other pleading."). If Defendants wish to replead the dismissed counterclaims, they must do so by January 29, 2015; any counts that are not repleaded by that date will be dismissed with prejudice.

January 8, 2015

_____
United States District Judge