UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SLEP-TONE ENTERTAINMENT CORPORATION, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | 13 C 2298 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| JOHN COYNE d/b/a EXTREME KARAOKE and | ) | |
| ABSOLUTE DISC JOCKEYS, ALLEN MANDO, | ) | |
| RACHEL YACKLEY, PETER GARCIA, and | ) | |
| KENNY SEIDMAN d/b/a DJ KENNY B, | ) | |
| | ) | |
| Defendants/Counter-Plaintiffs. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Slep-Tone Entertainment Corporation brought this suit against John Coyne, Allen Mondo, Rachel Yackley, Peter Garcia, and Kenny Seidman, alleging unauthorized use and display of Slep-Tone's Sound Choice trademarks in violation of §§ 32 and 43 of the Lanham Act, 15 U.S.C. §§ 1114, 1125, and the Illinois Deceptive Trade Practices Act, 815 ILCS 510/1 *et seq*. Doc. 1. The court denied Defendants' motion to dismiss. Docs. 51-52 (reported at 41 F. Supp. 3d 707 (N.D. Ill. 2014)). Defendants then asserted counterclaims alleging, among other things, that Slep-Tone defrauded the U.S. Patent and Trademark Office ("USPTO") into registering the marks. Doc. 53. The court dismissed all but one of the counterclaims, Docs. 90-91 (reported at 2015 WL 127836 (N.D. Ill. Jan. 8, 2015)), and Defendants later filed amended counterclaims, Doc. 103. Trial is set for February 22, 2016. Doc. 175.

Slep-Tone has moved for summary judgment on its claims, Doc. 113, and on the counterclaims, Doc. 151, and Defendants have cross-moved for partial summary judgment on two of the counterclaims, Doc. 145. Also before the court are three ancillary motions directed at the parties' Local Rule 56.1 materials and supporting evidence, Docs. 156, 160, 170, and Slep-

Tone's motion to sanction Defendants in connection with certain of their counterclaims, Doc. 96. For the following reasons, Slep-Tone is granted summary judgment on the antitrust and tortious interference counterclaims; the parties' summary judgment motions otherwise are denied; Slep-Tone's sanctions motion is denied without prejudice; and the three ancillary motions are granted in part, denied in part, and denied as moot in part.

## Background

When considering Slep-Tone's summary judgment motions, the facts are considered in the light most favorable to Defendants, and when considering Defendants' summary judgment motion, the facts are considered in the light most favorable to Slep-Tone. *See Cogswell v. CitiFinancial Mortg. Co.*, 624 F.3d 395, 398 (7th Cir. 2010) ("When the district court decides cross-motions for summary judgment … we construe all facts and inferences therefrom in favor of the party against whom the motion under consideration is made") (internal quotation marks omitted). On summary judgment, the court must assume the truth of those facts, but does not vouch for them. *See Smith v. Bray*, 681 F.3d 888, 892 (7th Cir. 2012).

Slep-Tone has moved to strike several paragraphs of Defendants' Local Rule 56.1(b)(3)(B) response to its Local Rule 56.1(a)(3) statement in support of its motion for summary judgment on its claims. Doc. 160. Slep-Tone also has moved to strike several paragraphs of Defendants' Local Rule 56.1(a)(3) response to its Local Rule 56.1(b)(3)(C) statement of additional facts in opposition to Defendants' summary judgment motion. Doc. 170. Some of the responses targeted by Slep-Tone are contradicted by admissions elsewhere in Defendants' Local Rule 56.1 materials. *Compare*, *e.g.*, Doc. 154-1 at ¶ 28 (denying Slep-Tone's assertion that 80-100 percent of a typical karaoke show is composed of Sound Choice tracks) *with* Doc. 152 at ¶ 27 (admitting the same). Some responses are not material to resolving the

summary judgment motions. To comprehensively address Slep-Tone's two motions to strike would make this opinion far longer than it needs to be, so the court will address the motions only as necessary, principally in the discussion of the antitrust and tortious interference counterclaims.

For their part, Defendants have moved to strike Slep-Tone's expert report and a declaration by Slep-Tone's founder, Kurt Slep. Doc. 156 at 5-9. Christopher Tragasz prepared the expert report regarding his forensic examination of Coyne's computer drives. Doc. 130. Defendants contend that the report violates Rule 26(a)(2)(B) because it does not identify who conducted the examination (incorrect: the report clearly states that Tragasz did, *id*. at 2); does not indicate how the analysis was conducted (incorrect: the report identifies which hard drives Tragasz examined, the software he used, and the results of his analysis, *id*. at 5-7, 14-56); and does not indicate how Tragasz knew the files were copies of Slep-Tone tracks or who altered the tracks (incorrect and irrelevant: Tragasz explained that he sampled the files and concluded that they were Sound Choice files based on their filename and graphical content, *id*. at 6, and one does not need to know who altered a file to conclude that the file has been altered). Doc. 156 at 5-7. Defendants' contentions are meritless for these reasons.

In their reply in support of their motion to strike, Defendants assert that Tragasz is not qualified to offer an expert opinion. Doc. 167 at 2-3. A reply brief is too late to first raise the issue of Tragasz's qualifications. *See Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) ("[T]he district court is entitled to find that an argument raised for the first time in a reply brief is forfeited."); *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 389 (7th Cir. 2003) ("Because Volvo raised the applicability of the Maine statute in its reply brief, the district court was entitled to find that Volvo waived the issue."). In any event, Tragasz has worked as a digital forensic examiner for over eight years, has extensive technical training, and has given expert

testimony in several cases. Doc. 130 at 8-12. That is sufficient to qualify him to testify as an expert on his forensic examination of Coyne's computer. *See United States v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005) ("[W]hile extensive academic and practical expertise is an area is certainly sufficient to qualify a potential witness as an expert, Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience.") (internal quotation marks omitted).

Defendants' motion to strike also contends that ¶¶ 8, 14-18, and 21 of Slep's declaration, Doc 115-1, are inadmissible because Slep-Tone did not disclose Slep as an expert witness. Doc. 156 at 7-9. Those paragraphs contain not expert testimony, but rather Slep's personal observations and opinions about Slep-Tone's business activities, the karaoke industry, and Slep's own inspection of the files on Coyne's drives. Slep is perfectly competent under Federal Rules of Evidence 602 and 701 to testify on those matters. That said, Slep-Tone admits that those paragraphs are "unnecessary to prove infringement," Doc. 165 at 6, and so the court will not rely on them in resolving the summary judgment motions. Defendants do not object to any other paragraphs in Slep's declaration, so any such objections are forfeited. *See G & S Holdings LLC v. Cont'l Cas. Co.,* 697 F.3d 534, 538 (7th Cir. 2012) ("We have repeatedly held that a party waives an argument by failing to make it before the district court.") (citations omitted).

A.      **Slep-Tone's and Defendants' Business Activities**

For almost thirty years, Slep-Tone has been a leading manufacturer of karaoke accompaniment tracks under the brand name "Sound Choice." Doc. 154-1 at ¶ 2, 16. Defendants deny this assertion, arguing that Slep's supporting declaration lacks foundation and that the record does not show that Slep-Tone was an "industry leader" for the entire period of its existence, *id*. at ¶ 16, but they do not object to the pertinent paragraphs of the declaration in their

motion to strike, Doc. 156. Moreover, Slep can testify to his own company's reputation in the karaoke industry, *see Alexis Lichine & Cie. v. Sacha A. Lichine Estate Selections, Ltd.*, 855 F. Supp. 479, 486 (D. Mass. 1994) (in a trademark case, admitting a party's testimony about his and his company's reputation in the wine industry), and Defendants adduce no contrary evidence.

Slep-Tone produces tracks by re-recording popular songs, omitting or fading out the lead vocals, and adding lyrics and visual cues that allow the karaoke participant to know when and what to sing. Doc. 154-1 at ¶ 19; Doc. 164 at ¶ 41. The company records many of its accompaniment tracks in the CD+G (compact disc plus graphics) format. Doc. 154-1 at ¶ 20. Slep-Tone also produces a product called the "GEM Series," which is intended for professional karaoke hosts—also known as "karaoke jockeys" or "KJs"—and which is recorded in a format called MP3+G. *Id*. at ¶ 23. Slep-Tone's primary consumers are karaoke hosts and karaoke venues. *Id*. at ¶ 22.

Slep-Tone products are quite popular, with 80-100 percent of the typical karaoke show composed of Sound Choice songs. Doc. 152 at ¶ 27. But the products have been widely pirated, with many users copying or uploading tracks from original Sound Choice products onto portable media, such as a computer or thumb drive; Slep-Tone calls this phenomenon "media shifting." Doc. 154-1 at ¶ 29. Slep-Tone maintains a "one-to-one" media-shifting policy, which means that every Sound Choice-branded track copied to portable media must be traceable to an original Sound Choice disc on a one-to-one basis. *Id*. at ¶ 30. KJs that violate the one-to-one policy are not authorized to use the Sound Choice-branded tracks in a commercial setting. *Id*. at ¶ 31. Slep-Tone estimates that 95% of active karaoke hosts have engaged in at least some unauthorized media-shifting. Doc. 152 at ¶ 27.

Although Slep-Tone manufactures karaoke tracks for sale to KJs and the general public, it does not sell karaoke services. Doc. 152 at ¶ 18, 22, 24. Slep-Tone has hosted karaoke performances at tradeshows and sponsored karaoke contests "to promote [Slep-Tone's] products" and to "educate consumers, engage with customers, build its public reputation and generate revenue." *Id*. at ¶¶ 20-21, 23. Slep-Tone asserts that its employees have "performed karaoke shows on behalf of Slep-Tone," *id*. at ¶ 19, but this assertion is not supported by the cited evidence. Slep-Tone cites Slep's testimony that the company "may have lent some tracks" to karaoke hosts for feedback during the GEM series' development, but that "[i]t's likely that there wasn't, outside of the trade show, … extensive involvement." Doc. 153-2 at 9. Slep continued, "It's not likely we would put on an entire karaoke show. The branded tracks may have been used in a show, but not hosting a show." *Ibid*. This testimony shows only that Slep-Tone employees lent tracks to get feedback on new products, not that those employees hosted karaoke performances on Slep-Tone's behalf.

Coyne, the lead defendant, operates Extreme Karaoke and Ultimate Disc Jockeys, which provide karaoke entertainment to venues in the Chicago area and for which the other defendants work as contractors or employees. Doc. 154-1 at ¶¶ 3-5. Coyne admits that he has violated Slep-Tone's media-shifting policy by not maintaining a one-to-one correspondence between the original discs and the files he uploaded to non-original media. *Id*. at ¶ 41. Coyne has copied or uploaded approximately 279 Sound Choice discs to five different laptop computers for the purpose of making the tracks available at multiple shows at the same time. *Id*. at ¶¶ 37, 42-43. Each copied track contains a copy of the Sound Choice mark affixed to each accompaniment track. *Id*. at ¶ 39. Some of Coyne's media-shifted tracks are slightly degraded copies of the originals; for example, the bit rates of at least some tracks are compressed and certain pixels are

missing from the accompanying graphical playback. *Id.* at ¶ 44. Defendants deny this assertion, claiming that it lacks foundation, but the assertion is supported by Slep's deposition testimony that he personally examined some of the files on Coyne's drive. Doc. 116 at 32; *see also* Doc. 154-1 at ¶ 56 (where Defendants admit to a missing pixel).

Coyne and the other defendants played the copied tracks at their commercial karaoke performances. Doc. 154-1 at ¶ 45. After Slep-Tone filed this suit, Coyne deleted all of the Sound Choice tracks from four of his five laptops to insure that the files were not used in pending litigation, and he provided the fifth laptop's hard drive to Slep-Tone's forensic expert. *Id.* at ¶ 54.

### B.    Slep-Tone's Registered Marks

Slep-Tone has registered several trademarks with the USPTO relating to the Sound Choice brand. The marks appear on Slep-Tone's products (including the discs and their packaging) and also are displayed when the video files on a Sound Choice disc are played or performed. Doc. 154-1 at ¶ 17. In 1995, Slep-Tone first registered the "SOUND CHOICE" word mark and the display mark  for "pre-recorded magnetic audio cassette tapes and compact discs containing musical compositions and compact discs containing video related to musical compositions." Doc. 154-1 at ¶¶ 10 (Registration No. 1,923,448), 12 (No. 2,000,725). In 2011, Slep-Tone registered the same word and display mark for services described as "conducting entertainment exhibitions in the nature of karaoke shows." *Id.* at ¶¶ 11 (Registration No. 4,099,045), 13 (Registration No. 4,099,052); Doc. 152 at ¶¶ 13-14, 33. The 2011 applications were submitted by Slep-Tone's general counsel, Jeffrey Harrington, who testified at his deposition that Slep-Tone registered the service marks to "close a hole" in its

rights.  Doc. 152 at ¶¶ 34-36.  The 2011 applications stated that the service marks were first used in commerce in 2010.  Doc. 154-1 at ¶¶ 11, 13.

Since 2010, Slep-Tone has required professional KJs to license the GEM series in order to use Sound Choice-brand accompaniment tracks.  *Id*. at ¶ 24; Doc. 164 at ¶ 47; Doc. 117 at 30-37 (copy of the license agreement).  Over 200 KJs have signed license agreements.  Doc. 164 at ¶ 48.  A KJ who signs the agreement is "granted a non-exclusive license to use the Media" on the GEM series "for the purpose of conducting a commercial business or for occasional private home use," subject to various restrictions, such as using the media only in the United States and Canada, complying with Slep-Tone's media-shifting policy, applying a identification sticker to the media, and letting Slep-Tone audit her media with one week's notice.  Doc. 117 at 31-33, ¶¶ 3, 4(b), (c), (g), (j).

The license agreement also grants KJs "a non-exclusive license to use the Marks for commercial purposes."  *Id*. at 31, ¶ 3.  KJs must limit use of the marks to

> (a) the display of the Marks in connection with … providing live karaoke entertainment services to third parties, *only* as part of the display of the synchronized graphical portion of the Content, and (b) the truthful identification of karaoke tracks as being SOUND CHOICE® tracks in an accompanying song listing.

Doc. 117 at 33, ¶ 5.  KJs also agree not to:

- "modify the manner in which the Marks are electronically displayed";

- "apply the Marks to any track to which it has not already be applied or to the listing of any track that did not originate with" Slep-Tone;

- "disparage, mutilate, or otherwise modify the Marks in any public place";

- "use the Marks in any advertising except as part of song listings";

- "undertake any action that brings the Marks or [Slep-Tone] into disrepute"; or

- "downsample, compress, or otherwise modify the Content of the Media in such a manner as to reduce the performance quality of that Content."

*Ibid*. Aside from these limitations, Slep-Tone exercises no control over a KJ's use of the tracks or karaoke performance. For example, Slep-Tone does not regulate the uniforms that KJs wear, the admission fees that venues charge, the volume at which or the audio equipment on which the tracks are played, or the contests or promotions that are offered at shows that display the Sound Choice marks. Doc. 152 at ¶ 25. Also, unlike purchasers of the GEM series, purchasers of CD+G discs need not sign license agreements even if they use the disc in a commercial setting like a karaoke show. *Id*. at ¶¶ 16-17, 28.

## Discussion

There is an ambiguity in the word "trademark," which "[d]epending upon the context … can denote the whole field of trademarks, service marks, trade names, certification and collective marks, and trade tress, or, less frequently, can mean more precisely only trade symbols used to identify goods, as opposed to services or companies." 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 4:19 (4th ed. 2006); *see also Platinum Home Mortg. Corp. v. Platinum Fin. Grp., Inc.*, 149 F.3d 722, 726 n.1 (7th Cir. 1998) ("The term 'trademark' can be used in a broad and generic sense to denote the entire field of trademarks, service marks, trade names, and trade dress."). This case calls for precision because Defendants' counterclaims challenge the validity only of Slep-Tone's 2011 marks, which purport to cover karaoke *services*, and not the 1995 marks, which cover karaoke *goods*. Accordingly, the 1995 marks will be called the "Sound Choice trademarks" and the 2011 marks will be called the "Sound Choice service marks." That distinction is less important when it comes to analyzing Slep-Tone's infringement claims, for "while the distinction between a trademark and a service mark may be relevant for registration purposes, it is not particularly relevant for the purposes of the likelihood of

confusion analysis," particularly where, as here, "the goods … are so intimately bound up with the services … that distinguishing them is fruitless." *Frehling Enters., Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1334 n.1 (11th Cir. 1999) (collecting cases); *see also Murphy v. Provident Mut. Life Ins. Co. of Phila.*, 923 F.2d 923, 927 (2d Cir. 1990) ("[U]nder the facts of this case, it makes little difference whether Murphy is claiming a trademark or a servicemark. … Whether a mark is one or the other, the standards for determining infringement are essentially the same.").

## I.     The Cross-Motions for Summary Judgment

Slep-Tone's complaint asserts three claims: trademark infringement and unfair competition under the Lanham Act, and violations of the Illinois Deceptive Trade Practices Act ("IDPTA"). Doc. 1. Defendants assert seven counterclaims. Doc. 103. Counterclaim I seeks a declaratory judgment that the Sound Choice service marks are invalid because they were fraudulently procured. *Id*. at ¶¶ 54-58. Counterclaim II is the mirror image of Slep-Tone's claims; it seeks a declaratory judgment that Defendants have not committed trademark infringement because there is no likelihood of confusion between Slep-Tone's and Defendants' use of the marks. *Id*. at ¶¶ 59-66. Counterclaims III and IV seek cancellation of the Sound Choice service marks under 15 U.S.C. § 1064(3), and Counterclaim V seeks damages for fraudulent procurement of those marks under 15 U.S.C. § 1120. *Id*. at ¶¶ 67-86. Counterclaim VI accuses Slep-Tone of violating the antitrust laws by conspiring to sue KJs who do not enter agreements with Slep-Tone or who attempt to underbid Slep-Tone-endorsed KJs. *Id*. at ¶¶ 87-116. Finally, Counterclaim VII alleges that Slep-Tone has committed tortious interference with contract by sending threatening communications to venues where Defendants provide karaoke services. *Id*. at ¶¶ 117-129.

Slep-Tone seeks summary judgment on all of its claims and all of Defendants'
counterclaims. Docs. 113, 154. Defendants seek summary judgment only on the cancellation
counterclaims (Counterclaims III and IV). Doc. 145.

### A.      Validity of the Slep-Tone Service Marks (Counterclaims I & III-V)

Counterclaims I and III-V accuse Slep-Tone of committing fraud in its 2011 service mark
application. To register a mark with the USPTO, the applicant must attest that the mark is being
used in commerce or that it has a bona fide intention to use the mark in commerce. *See* 15
U.S.C. § 1051(a)(3)(C), (b)(3)(B); 37 C.F.R. § 2.34(a)(1), (2). The mark can be used in
commerce directly by the applicant or indirectly through a "related company." *See* 15 U.S.C.
§ 1055 ("Where a ... mark sought to be registered is or may be used legitimately by related
companies, such use shall inure to the benefit of the registrant or applicant for registration.").
The Lanham Act defines "use in commerce" as follows:

> The term "use in commerce" means the bona fide use of a mark in the
> ordinary course of trade, and not made merely to reserve a right in a mark.
> For purposes of this chapter, a mark shall be deemed to be in use in
> commerce—
>
>     (1) on goods when—
>
>         (A) it is placed in any manner on the goods or their containers or the
>         displays associated therewith or on the tags or labels affixed thereto, or
>         if the nature of the goods makes such placement impracticable, then on
>         documents associated with the goods or their sale, and
>
>         (B) the goods are sold or transported in commerce, and
>
>     (2) on services when it is used or displayed in the sale or advertising of
>     services and the services are rendered in commerce, or the services are
>     rendered in more than one State or in the United States and a foreign
>     country and the person rendering the services is engaged in commerce in
>     connection with the services.

15 U.S.C. § 1127.

Slep-Tone's 2011 application states that the Sound Choice service marks were used in commerce "[a]t least as early as 07/21/2010," and it attaches a photograph "of a performance of the services by a licensee." Doc. 61-1 at 2. According to Defendants, this statement is false "because neither Slep nor any of its agents were using the mark for the purpose of conducting karaoke shows nor have they ever been in the business of conducting entertainment karaoke shows." Doc. 103 at ¶ 70. Slep-Tone defends its 2011 application on two grounds. First, it argues that it directly used the marks in 2010. Doc. 151 at 6. Second, it argues that the marks were used on services by its related companies, the GEM series licensees. *Id*. at 6-9. Each ground will be addressed in turn.

### 1.      Direct Use in Commerce

Although Slep-Tone's 2011 application states only that the Sound Choice marks were used in commerce by licensees, Slep-Tone now claims that it directly used the marks while hosting karaoke at tradeshows and sponsoring contests. Hosting karaoke at tradeshows and sponsoring contests, however, are not "services" under the Lanham Act. The statute provides that a mark is used in commerce on services only "when it is used or displayed in the sale or advertising of services and the services are rendered in commerce." 15 U.S.C. § 1127. Slep-Tone did not host karaoke to advertise its services; rather, it hosted karaoke to advertise its goods, namely, the Sound Choice tracks. Defendants argue that "promotion of one's own goods is not a service," Doc. 163 at 3 (citing *In re Radio Corp. of America*, 205 F.2d 180 (C.C.P.A. 1953)), and in so arguing they are correct. *See Murphy*, 923 F.2d at 927 ("[T]he theme of Murphy's advertising campaign is not a service for which a servicemark could be claimed. It follows that, if Murphy was selling … a product … he performed no services that a servicemark might be said to identify."); *In re Dr. Pepper Co.*, 836 F.2d 508, 509-10 (Fed. Cir. 1987) ("the

rendering of a service which is normally 'expected or routine' in connection with the sale of one's own goods is not a registrable service whether denominated by the same or a different name from the trademark for its product"); *In re Reichhold Chems., Inc.*, 167 U.S.P.Q. (BNA) 376 (T.T.A.B. 1970) ("The only restriction on the registration of the same term both as a trademark and as a service mark is that … specimens filed in a service mark application must show the mark 'used or displayed in the sale or advertising of services' as distinguished from use in the sale or advertising of goods sold by the applicant."); 3 McCarthy, *supra*, § 19:89 ("even though a given term may function as both a trademark and a service mark, the service must constitute more than mere promotion and advertising of one's own goods"); *Trademark Manual of Examining Procedure* § 1301.01(b)(i) (7th ed. 2010) ("Conducting a contest to promote the sale of one's own goods is usually not considered a service, even though benefits may accrue to the winners of the contest. Such a contest is usually ancillary to the sale of goods or services, and is nothing more than a device to advertise the applicant's products or services.").

Conceding that it hosted karaoke at tradeshows and sponsored contests to promote its products, Slep-Tone observes that the events also were intended to "educate consumers, engage with customers, build its public reputation and generate revenue." Doc 152 at ¶ 23. Yet none of these things are services either. *See* 3 McCarthy, *supra*, § 19:84 ("to constitute a registerable 'service' the activity must … be performed to the order of, or for the benefit of, someone other than the applicant; and … must be qualitatively different from anything necessarily done in connection with the sale of the applicant's goods"). This stands to reason, for Slep-Tone is not in the business of hosting karaoke shows for payment. Doc. 152 at ¶¶ 20-24. It follows that Slep-Tone did not use the marks on services at Slep-Tone's tradeshow performances and

contests, and therefore that Slep-Tone "performed no services" at these events "that a servicemark might be said to identify." *Murphy*, 923 F.2d at 927.

### 2. Indirect Use in Commerce

Invoking the related company doctrine, Slep-Tone argues in the alternative that it properly claimed use in commerce of the Sound Choice service marks through its licensees. Doc. 151 at 6-9. "Related company" means "any person whose use of a mark is controlled by the owner of the mark with respect to the nature and quality of the goods or services on or in connection with which the mark is used." 15 U.S.C. § 1127. The key term is "controlled," as a so-called "naked license" of a mark will not inure to the benefit of the licensor and may indeed forfeit an existing interest in the mark. *See In re XMH Corp.*, 647 F.3d 690, 695 (7th Cir. 2011); *Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 435 (7th Cir. 1989) ("The owner of a trademark has a duty to ensure the consistency of the trademarked good or service. If he does not fulfill this duty, he forfeits the trademark."); *Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 823 (3d Cir. 2006) ("Failure to provide quality control may constitute naked licensing, leading to abandonment of the mark."). A party claiming that a trademark holder has engaged in naked licensing faces a heavy burden. *See TMT N. Am., Inc. v. Magic Touch GmbH*, 124 F.3d 876, 885 (7th Cir. 1997) (discussing "the 'heavy burden on [a] person asserting a lack of reasonable control by a licensor'") (quoting Restatement (Third) of Unfair Competition § 33 cmt. c (1995)); *Doebler*, 442 F.3d at 824 (collecting cases).

Slep-Tone's argument for control centers on the GEM license agreement. As noted above, commercial KJs must sign such licenses in order to license the GEM product. In addition to licensing use of the karaoke tracks, the agreement grants a "non-exclusive license to use the Marks for commercial purposes, subject to the restrictions found in paragraph 5." Doc. 117 at

31, ¶ 3.  The agreement defines "Marks" to mean both the 1995 Sound Choice trademarks and the 2011 Sound Choice service marks.  *Id*. at 31, ¶ 1(h).

The question whether a licensor exercises enough control over a licensee's use of a mark to successfully assert indirect use in commerce turns on "whether the control retained by the licensor is sufficient under the circumstances to insure that the licensee's goods or services would meet the expectation created by the presence of the trademark."  *Eva's Bridal Ltd. v. Halanick Enters., Inc.*, 639 F.3d 788, 790 (7th Cir. 2011) (internal quotation marks and alterations omitted).  Slep-Tone argues that the GEM series license agreement includes several provisions to insure that level of quality.  Doc. 151 at 8-9.  First, it notes that ¶ 5 of the agreement provides that the licensee will not modify the manner in which the marks are electronically displayed, will not apply the marks to any non-original track, and will not disparage, mutilate, or modify the marks.  Doc. 117 at 33, ¶ 5.  These restrictions are beside the point.  The "control" required for the use in commerce requirement is not control over the *mark*, but rather control over the *service* that the mark identifies.  *See Oberlin v. Marlin Am. Corp.*, 596 F.2d 1322, 1327 (7th Cir. 1979) (requiring enough "control over the day-to-day operations of a licensee … to ensure uniform quality of the product or service in question"); Restatement (Third) of Unfair Competition § 33 ("If the licensor exercises reasonable control over the nature and quality of the goods, services, or business *on which the designation is used* by the licensee, any rights in the designation arising from the licensee's use accrue to the benefit of the licensor.") (emphasis added).

The only aspect of ¶ 5 that concerns a licensee's services is the requirement that KJs "not downsample, compress, or otherwise modify the Content of the Media in such a manner as to reduce the performance quality of that Content."  Doc. 117 at 33, ¶ 5.  Other than that, Slep-Tone

exercises no control over a KJ's performance; indeed, GEM-licensed KJ does not have to play only Slep-Tone-branded music. Doc. 152 at ¶¶ 25. And Slep-Tone does not even require customers using a CD+G disc to sign a license agreement, even if they use the disc to display the Sound Choice marks during commercial karaoke performances. *Id*. at ¶ 16. Those facts tend to undermine Slep-Tone's argument that it exercises sufficient control over its licensees to establish indirect use in commerce under the related company doctrine.

Still, the record does not grant victory to Defendants for purposes of *their* summary judgment motion. As a general rule, a licensor forfeits its interest in a mark only in the "extreme case" where it "exercise[s] *no* authority over the appearance and operations of" the licensee's business. *Eva's Bridal*, 639 F.3d at 791. As an example, the Seventh Circuit observed that "Safeway could not license its marks to a corner grocery store, while retaining no control over inventory, appearance, or business methods, just because every grocery store is sure to have Coca-Cola and Wheaties on the shelf." *Ibid*. Slep-Tone, by contrast, has retained some control over the quality of its licensees' services—not much, but some. And while Slep-Tone admits it must rely in part on its licensees' good faith in putting on a high quality show, Doc. 152 at ¶ 31, such reliance may support trademark rights in some circumstances. *See TMT*, 124 F.3d at 885 ("We tend towards … [a] flexible approach [that] allows licensors to rely at least somewhat on the reputation and expertise of licensees."); Restatement (Third) of Unfair Competition § 33 cmt. c ("If the trademark owner is justified in relying on the reputations and expertise of the licensee, the existence of contractual obligations undertaken by the licensee may be sufficient in itself to constitute reasonable quality control … at least in the absence of evidence indicating significant deviations from the agreed standards or procedures.").

Ultimately, the answer to the control question depends on the particular facts and circumstances of the case. "How much authority is enough can't be answered generally; the nature of the business, and customers' expectations, both matter." *Eva's Bridal*, 639 F.3d at 791. Yet neither party has said anything about the nature of the karaoke business or customers' expectations when attending karaoke shows. Perhaps karaoke customers associate a "Sound Choice" show only with the performance quality of the commercial-grade GEM series and little else. In that case, Slep-Tone's restrictions on copying, coupled with its reliance on its licensees' good faith, might be enough to protect Slep-Tone's interest in the marks and prove control. But if karaoke customers are concerned with other factors—the KJ's uniform, track listings, audio equipment, and so forth—which Slep-Tone concededly does not control, then Defendants may be right that Slep-Tone does not exercise the requisite control. On the present record, neither party has shown that summary judgment is warranted on the question whether Slep-Tone exercised enough control to establish indirect use in commerce. It follows that neither party is entitled to summary judgment on the counterclaims challenging the validity of the Sound Choice service marks.

Incidentally, even if Slep-Tone's 2011 service mark applications wrongly asserted use in commerce through its licensees, Defendants still would not be entitled to summary judgment on those counterclaims. To be fraudulent, a statement to the USPTO cannot be merely false, but must be intentionally false. "There is no fraud if a false misrepresentation is occasioned by an honest misunderstanding or inadvertence without a willful intent to deceive." *In re Bose Corp.*, 580 F.3d 1240, 1246 (Fed. Cir. 2009); *see also Money Store v. Harriscorp Fin., Inc.*, 689 F.2d 666, 670 (7th Cir. 1982) ("Fraud will be deemed to exist only when there is a deliberate attempt to mislead the Patent Office into registering the mark."). Defendants argue that Slep-Tone had

the necessary intent because its general counsel, who filed the service mark applications, had practiced trademark law for four years and testified that he intended to "close a hole" in Slep-Tone's rights.  Doc. 145 at 11-12.  This does not come close to indisputably demonstrating, for summary judgment purposes, that Slep-Tone filed the applications with fraudulent intent.

Accordingly, Defendants' motion for partial summary judgment on the cancellation counterclaims (III and IV) is denied.  Slep-Tone's motion is denied as well, both as to those counterclaims and also as to Counterclaims I (for a declaratory judgment that the service marks are invalid because they were fraudulently procured) and V (seeking damages for fraud).

### B.      Lanham Act and IDTPA (Claims I-III & Counterclaim II)

As noted, Slep-Tone brings infringement and unfair competition claims under the Lanham Act and also a claim under the IDTPA.  Doc. 1.  As the court previously explained and as the parties agree, "federal and state laws regarding trademarks and related claims of unfair competition are substantially congruent" and therefore can be analyzed together.  41 F. Supp. 3d at 712 (quoting *TMT N. Am.*, 124 F.3d at 881) (internal quotation marks omitted).  Counterclaim II, which seeks a declaratory judgment that Defendants did not commit infringement, is essentially a mirror image of Slep-Tone's claims.  Because Slep-Tone's three claims and Counterclaim II rise and fall together, for simplicity the court will analyze only the trademark infringement claim.

To prevail on such a claim, the plaintiff must establish "that (1) [its] mark is protectable, and (2) the defendant's use of the mark is likely to cause confusion among consumers." *Packman v. Chi. Tribune Co.*, 267 F.3d 628, 638 (7th Cir. 2001); *see also Anago Franchising, Inc. v. IMTN, Inc.*, 477 F. App'x 383, 385 (7th Cir. 2012).  As for the first element, the Lanham Act provides that a registered mark that "has been in continuous use for five consecutive years"

and "is still in use in commerce" is "incontestable," which means that its registration "shall be conclusive evidence of the validity of the registered mark … and of the registrant's exclusive right to use the registered mark in commerce." 15 U.S.C. §§ 1065, 1115(b). Slep-Tone argues that its marks "undoubtedly achieved incontestability status with the USPTO in 2000," Doc. 113-1 at 8, although it necessarily concedes that this is true only for the 1995 Sound Choice trademarks. Doc. 168 at 5. The 2011 Sound Choice service marks were registered within the past five years, and as shown above, the question remains whether those marks are valid. Nevertheless, because Slep-Tone is correct that the 1995 Sound Choice trademarks are valid and protected, it has satisfied the first element with respect to them.

To satisfy the second element, Slep-Tone must show that Defendants' unauthorized display of the Sound Choice trademarks was likely to confuse consumers. Confusion occurs "when customers mistakenly think that the junior user's goods or services are from the same source as or are connected with the senior user's goods or services." *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 957 (7th Cir. 1992). A seven-factor test governs the likelihood of confusion element: "[1] the degree of similarity between the marks in appearance and suggestion; [2] the similarity of the products for which the name is used; [3] the area and manner of concurrent use; [4] the degree of care likely to be exercised by consumers; [5] the strength or 'distinctiveness' of the complainant's mark; [6] actual confusion; and [7] an intent on the part of the alleged infringer to palm off his products as those of another." *Fortres Grand Corp. v. Warner Bros. Entm't Inc.*, 763 F.3d 696, 702 (7th Cir. 2014) (alterations omitted).

Slep-Tone contends that "each and every factor" cuts in its favor. Doc. 168 at 13. But Slep-Tone offers no evidence on the sixth factor, actual confusion. Although it rightly notes that "evidence of actual confusion … is not required to prove that a likelihood of confusion exists,"

*CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 685 (7th Cir. 2001), the absence of such evidence hardly results in the sixth factor assisting Slep-Tone's on the likelihood of confusion.

Defendants admit to copying Sound Choice tracks and to playing the copied tracks at commercial performances. Therefore, the first factor, similarity of the marks, is satisfied—both the authorized and unauthorized tracks display the Sound Choice marks. Slep-Tone has also shown that its mark is distinctive for purposes of the fifth factor: Slep-Tone has been a presence in the karaoke industry for decades, and Sound Choice tracks (authorized or not) have become a staple at most karaoke shows.

The remaining factors are not so clear cut. The second factor concerns the similarity of the products. Slep-Tone and Defendants offer different products that they sell to different, albeit overlapping, markets: Slep-Tone sells karaoke tracks primarily to venues and to KJs, while Defendants sell services primarily to venues. The court previously held, in the Rule 12(b)(6) context, that Slep-Tone's and Defendants' selling to different purchasers is not conclusive in Defendants' favor because trademark rights "extend to any goods that might be, in the minds of consumers, 'related.'" 41 F. Supp. 3d at 715 (quoting *CAE*, 267 F.3d at 679). The court continued that "the more accurate inquiry is whether the public is likely to attribute the products and services to a single source." *Ibid.* (quoting *CAE*, 267 F.3d at 679). And the court noted that "it is *plausible* that consumers of Defendants' karaoke jockeying services could reasonably conclude from displays bearing the Sound Choice mark and song booklets advertising Sound Choice tracks that Defendants' show was affiliated with, connected with, or sponsored by Slep–Tone." *Ibid.* (emphasis added).

Slep-Tone contends that the court's Rule 12(b)(6) holding establishes that it is not only plausible, but also "likely," that consumers would conclude that Defendants' shows were

affiliated with or sponsored by Slep-Tone. Doc. 113-1 at 10. But that holding does not

establish, let alone suggest, any such thing. That an allegation is plausible for purposes of a

motion to dismiss does not make it undisputed at summary judgment. *See Bible v. United*

*Student Aid Funds, Inc.* __ F.3d __, 2015 WL 4911412, at *2 (7th Cir. Aug. 18, 2015) (holding

that in the context of a motion to dismiss, "'[p]lausibility is not a synonym for 'probability'");

*Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 463 (7th Cir. 2010) ("[T]he bar to survive a motion to

dismiss is not high."). If the public understands that karaoke track manufacturers and karaoke

jockeys operate in different parts of the karaoke market, they may not consider Defendants' use

of the Sound Choice marks on displays or song booklets as an "endorsement" or "authorization"

by Slep-Tone. A reasonable jury might instead view KJs as unaffiliated performers who happen

to use some tracks originally produced by Slep-Tone; as Defendants correctly observe, a

reasonable person need not believe that "Gibson Guitars [is] in the band just because the guitarist

used their products." Doc. 145 at 7; *cf. AutoZone, Inc. v. Strick*, 543 F.3d 923, 931 (7th Cir.

2008) ("No consumer would mistake an AutoZone store, which mainly sells products, for a

WashZone or an Oil Zone, which primarily provides services. But … a reasonable consumer

*may* very well be led to believe that Oil Zone and Wash Zone are AutoZone spinoffs.")

(emphasis added). A reasonable jury thus could view the second factor either way.

The third factor, the area and manner of concurrent use, asks "whether there is a

relationship in use, promotion, distribution, or sales between the goods and services of the

parties." *CAE*, 267 F.3d at 681 (quoting *Forum Corp. of N. Am. v. Forum, Ltd.*, 903 F.2d 434,

442 (7th Cir. 1990)). This factor encompasses several subsidiary factors, such as the area of

geographical distribution, evidence of direct competition between the products, whether the

products are sold to consumers in the same type of store and (if so) the same section of the store,

and whether the product is sold through the same marketing channels. *See Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 900 (7th Cir. 2001). The record shows that Slep-Tone and Defendants sell their goods and services in the Chicago area and advertise to some of the same customers. Yet Slep-Tone has presented no evidence about either party's marketing or sales activities, and it is not at all clear that Slep-Tone's products and Defendants' services are in direct competition.

The fourth factor, the degree of care likely to be exercised by consumers, asks how much attention each side's customers pay to their purchasing decisions—the less attention, the more likely it is that those customers would be misled or confused by an infringing mark. *See Sorensen v. WD-40 Co.*, 792 F.3d 712, 730-31 (7th Cir. 2015); *CAE*, 267 F.3d at 683. Slep-Tone believes that this factor is satisfied because "karaoke industry players [and] bar patrons alike would not be able to tell the difference between an unauthorized use of the Sound Choice Trademark and a genuine authorized use." Doc. 113-1 at 12. This argument conflates the first factor (similarity of the marks) with the fourth. The fact that consumers cannot tell the marks apart says nothing about their care in selecting karaoke products or their propensity to be misled into purchasing Defendants' services or avoiding Slep-Tone's goods.

The seventh factor concerns whether Defendants intended to "pass" or "palm off" their services as Slep-Tone's. Slep-Tone argues that because Coyne admitted to willfully copying the Sound Choice tracks, his intent to pass off Slep-Tone's products as his own is self-evident. Doc. 113-1 at 13-15. But willfully copying a product is not the same as intending to pass it off. The Seventh Circuit has explained that "passing off" means "trying to get *sales* from a competitor by making consumers think that they are dealing with that competitor, when actually they are buying from the passer off." *AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 829 (7th Cir. 2002) (emphasis added, internal quotation marks omitted); *see also Sands, Taylor*, 978 F.2d

at 961 ("intent is relevant to the issue of likelihood of confusion only if [the defendant] intended to palm off his products as those of another, thereby profiting from confusion") (internal quotation marks omitted). Although Slep-Tone has shown that Coyne intended to copy its products without authorization, it has not shown that he intended to pass off his own services as someone else's and thereby capture customers that otherwise would have purchased from Slep-Tone.

Because likelihood of confusion is such a fact-intensive inquiry, "a motion for summary judgment in trademark infringement cases must be approached with great caution." *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 616 (7th Cir. 1993). Likelihood of confusion "may be resolved on summary judgment only if the evidence is so one-sided that there can be no doubt about how the question should be answered." *AutoZone*, 543 F.3d at 929 (internal quotation marks omitted). While "[n]o single factor" in the analysis "is dispositive," "[i]n many cases, … three of the factors are likely to be particularly important: the similarity of the marks, the defendant's intent, and actual confusion." *CAE*, 267 F.3d at 678. Here, the similarity of the marks favors Slep-Tone, but Defendants' intent and actual confusion are toss-ups on the summary judgment record. And while "the district court must give appropriate weight to the factors that are particularly important based on the facts of each case," *id*. at 686-87, Slep-Tone has offered no reason why the only other factor clearly in its favor—the mark's distinctiveness—should loom especially large in the analysis. In sum, because likelihood of confusion is not a clear winner for Slep-Tone, its infringement claims must go to the jury.

This disposition makes it unnecessary to address Defendants' two other arguments in opposition to summary judgment: that *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003), bars Slep-Tone's trademark claim, Doc. 145 at 2, and that the display of the

Sound Choice marks is protected by the nominative fair use doctrine, Doc. 154 at 10-11. The court notes, however, that it has already rejected Defendants' reliance on *Dastar*, 41 F. Supp. 3d at 719, as have several other decisions. *See Slep-Tone Entm't Corp. v. Sellis Enters., Inc.*, __ F. Supp. 3d __, 2015 WL 1593498, at *4-6 (N.D. Ill. Apr. 3, 2015); *Slep-Tone Entm't Corp. v. Am.'s Bar & Grill, LLC*, 2014 WL 4057442, at *3 (N.D. Ill. Aug. 15, 2014); *Slep-Tone Entm't Corp. v. Elwood Enters., Inc.*, 2014 WL 1612891, at *5 (N.D. Ill. Apr. 21, 2014).

### C.     Antitrust and Tortious Interference (Counterclaims VI-VII)

Slep-Tone seeks summary judgment on the antitrust and tortious interference with contract counterclaims. Doc. 151 at 11-15. The antitrust counterclaim invokes the Sherman Act and Clayton Act, 15 U.S.C. §§ 1-7, 12-27. Doc. 103 at ¶¶ 87-116. The tortious interference counterclaim alleges that Slep-Tone, intending to destroy Defendants' employment prospects and serve as an example to other potential KJs, purposefully targeted venues where the Defendants performed. *Id.* at ¶¶ 117-129. Before addressing the merits, the court takes up Slep-Tone's challenges to Defendants' Local Rule 56.1 responses regarding those counterclaims.

### 1.     Local Rule 56.1

Paragraphs 56-67 of Slep-Tone's Local Rule 56.1(b)(3)(C) statement—which is styled as a Local Rule 56.1(b)(3)(C) statement rather than a Local Rule 56.1(a)(3) statement because it was submitted as part of a combined summary judgment motion on the counterclaims/response to Defendants' summary judgment on the counterclaims—assert that there is no evidence from which a jury could conclude that it violated the antitrust laws:

> 56.   There is no evidence that Slep-Tone entered into any agreements with third-parties to raise prices for karaoke tracks and services within the karaoke industry and/or to institute lawsuits against KJs and/or to coerce KJs and venues into entering agreements. Specifically, there is no agreement between Slep-Tone and Digitrax or Slep-Tone and Piracy Recovery, LLC.

57.	There is no evidence that Slep-Tone entered into any agreements with third-parties to split the market and/or prevent competing karaoke track manufacturers from entering the market.

58.	There is no evidence that Slep-Tone entered into any agreements with third-parties to restrain the ability of new karaoke service providers from entering the market based upon legal costs and startup costs.

59.	There is no evidence that Slep-Tone entered into agreements with outside KJs, or any third party, in order to raise the price of karaoke services or to pursue lawsuits against KJs who would underbid other KJs or pursue lawsuits against venues that hired non-endorsed KJs to insure that only Slep-Tone endorsed KJs could provide services.

60.	There is no evidence that Slep-Tone entered into agreements with outside KJs to raise the cost of KJ services for venues and otherwise force KJs out of the industry that refused to pay Plaintiff "protection money."

61.	There is no evidence that any actions taken by Plaintiff are meant to drive up the price of services and otherwise eliminate the ability of other companies to enter into the karaoke accompaniment track market.

62.	There is no evidence that Slep-Tone maintains separate pricing for customers based upon competition.

63.	The price structure of Slep-Tone's products varies depending on the number of tracks that are being licensed and/or any given sales going on at a certain time.  Just like any business, they engage in discounting to stimulate sales of licenses.

64.	There is no evidence that Defendants have lost work based upon other KJs ability to buy tracks and avoid litigation and in turn provide services at reduced prices based upon their agreements with Plaintiff.

65.	There is no evidence that Plaintiff has demonstrated its intent to monopolize the karaoke track market.

66.	There is no evidence that many venues in Chicago have ceased to provide karaoke at their venues or that the Defendants personally have lost work at least three times.

67.	There is no evidence that Plaintiff's actions hinder trade and represent unfair competition among those persons providing karaoke services or selling karaoke tracks.

Doc. 152 at ¶¶ 56-67 (citations to exhibits omitted).  Likewise, ¶¶ 69-72 of Slep-Tone's Local

Rule 56.1(b)(3)(C) statement assert that there is no evidence from which a jury could conclude

that it committed tortious interference with contract:

> 69.  Plaintiff has only filed lawsuits against venues after finding evidence of
> infringing activities and after sending venues letters advising them of
> said infringing activity.
>
> 70.  There is no evidence that Defendants had, or currently have any
> contracts, oral or written, with venues for its services.
>
> 71.  There is no evidence that based upon an oral contract, Potato Creek
> Johnny's required Defendants to perform services twice a week, on
> Tuesdays and Thursdays.
>
> 72.  Plaintiffs contacted some of Defendants' venues to put them on notice of
> the improper and illegal use of its trademarks occurring at their
> businesses due to Defendants activities.

*Id*. at ¶¶ 69-72 (citations to exhibits omitted).  Defendants admit ¶ 63, but deny the other

paragraphs.  Doc. 164 at ¶¶ 56-67, 69-72.

Defendants fail to support their denials of Slep-Tone's ¶¶ 56-61 and 65 with specific

references to the record.  Those denials cite "Reply Exhibit A," which is a 22-page counterclaim

filed by a different litigant in a different case in another court, Doc. 163-1, and "videos," which

are 15 and 58 minutes long.  Doc. 164 at ¶¶ 56-61, 65.  Defendants do not say which part or parts

of those lengthy exhibits actually controvert Slep-Tone's ¶¶ 56-61 and 65.  That violates Local

Rule 56.1.  As the Seventh Circuit has held:

> [W]here a non-moving party denies a factual allegation by the party moving
> for summary judgment, that denial must include a specific reference to the
> affidavit or other part of the record that supports such a denial.  Citations to an
> entire transcript of a deposition or to a lengthy exhibit are not specific and are,
> accordingly, inappropriate.  A court should not be expected to review a
> lengthy record for facts that a party could have easily identified with greater
> particularity.

*Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817-18 (7th Cir. 2004); *see also Friend v. Valley View Cmty. Unit Sch. Dist. 365U*, 789 F.2d 707, 710 (7th Cir. 2015); *Brasic v. Heinemann's, Inc.*, 121 F.3d 281, 285 (7th Cir. 1997).  And as a judge in this District has explained:

> "[S]pecific reference" [in Local Rule 56.1(b)(3)(B)] means including proper … citations to exact pieces of the record that support the factual contention contained in the paragraph.  In other words, citations must include page (or paragraph) numbers, as opposed to simply citing an entire deposition, affidavit, or other exhibit document: District courts are not obliged in our adversary system to scour the record looking for factual disputes.  Factual allegations not properly supported by citation to the record are nullities.

*Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000) (internal quotation marks and citation omitted); *see also Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1001 (7th Cir. 2004); *Panoramic Stock Images, Ltd. v. John Wiley & Sons, Inc.*, 2014 WL 4344095, at *1 (N.D. Ill. Sept. 2, 2014); *Schwab v. N. Ill. Med. Ctr.*, 42 F. Supp. 3d 870, 874 (N.D. Ill. 2014); *Diadenko v. Folino*, 890 F. Supp. 2d 975, 982 n.4 (N.D. Ill. 2012).

This court may and should strictly enforce Local Rule 56.1.  *See Stevo v. Frasor*, 662 F.3d 880, 886-87 (7th Cir. 2011) ("Because of the high volume of summary judgment motions and the benefits of clear presentation of relevant evidence and law, we have repeatedly held that district judges are entitled to insist on strict compliance with local rules designed to promote the clarity of summary judgment filings."); *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 360 (7th Cir. 2009) ("[w]e have repeatedly held that the district court is within its discretion to strictly enforce compliance with its local rules regarding summary-judgment motions"); *Cichon v. Exelon Generation Co.*, 401 F.3d 803, 809 (7th Cir. 2005) ("We have … repeatedly held that a district court is entitled to expect strict compliance with Rule 56.1.").  The Seventh Circuit has "consistently held that a failure to respond by the nonmovant as mandated by the local rules results in an admission."  *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).  Whether they seek

or oppose summary judgment, parties have a right to expect that Local Rule 56.1 will be enforced and that facts or denials not properly presented under the rule will be disregarded. *See Renta v. Cook Cnty.*, 2011 WL 249501, at *1-2 (N.D. Ill. Jan. 26, 2011). Therefore, the court deems admitted ¶¶ 56-61 and 65 of Slep-Tone's Local Rule 56.1(b)(3)(C) statement.

Defendants' denial of Slep-Tone's ¶ 56 is deficient for the independent reason that it relies on the above-referenced counterclaims from a different case. Doc. 164 at ¶ 56. Pleadings make allegations and, absent exceptions not pertinent here, do not qualify as evidence. Summary judgment requires the non-moving party to "go beyond the pleadings … to demonstrate that there is evidence upon which a jury could return a verdict in their favor." *Modrowski v. Pigatto*, 712 F.3d 1166, 1169 (7th Cir. 2013) (internal quotation marks omitted). "Just as [a party] cannot rely on her own pleadings as evidence to defeat summary judgment, she cannot rely on the pleadings filed by other plaintiffs in other cases." *Wright v. Farouk Sys., Inc.*, 701 F.3d 907, 911 n.8 (11th Cir. 2012). Accordingly, Slep-Tone's ¶ 56 is admitted for this reason as well.

Defendants deny Slep-Tone's ¶¶ 64, 66-67, and 70-71 without citing any evidence; instead, they state: "Defendants were unable to obtain affidavits based upon the timing of the motions. Based upon that, the Defendants request time to obtain the affidavits." Doc. 164 at ¶¶ 64, 66-67, 70-71. Defendants later sought permission—without citing Rule 56(d)—to submit a declaration from Coyne to support their denials. Doc. 177 at 4 (stating that Defendants "were unable to obtain the declarations based upon the timing of the brief schedule and the newly raised issues in Plaintiff's Response/Cross Motion").

Defendants' request is denied. Although Rule 56(d) permits a non-movant to seek additional time to obtain affidavits or take discovery, it must first "show[] by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition."

Fed. R. Civ. P. 56(d). Thus, a party invoking Rule 56(d) "must state the reasons why the party cannot adequately respond to the summary judgment motion without further discovery and must support those reasons by affidavit." *Deere & Co. v. Ohio Gear*, 462 F.3d 701, 706 (7th Cir. 2006). Defendants did not even attempt to explain why the "timing of the motions" prevented them at the time they responded to Slep-Tone's motion from obtaining affidavits—and not just *any* affidavit, but an affidavit from Coyne, the lead defendant—to support their counterclaims. It follows that Coyne's inexcusably tardy declaration will not be considered, and, with no evidence to support Defendants' denials, Slep-Tone's ¶¶ 64, 66-67, and 70-71 are admitted.

### 2.    Antitrust Counterclaim

Slep-Tone argues that the Sherman Act § 1 counterclaim fails because there is no evidence that it had any agreements or conspired with any third party to restrain trade in the karaoke market, and that the Sherman Act § 2 counterclaim fails because there is no "dangerous probability" that it will monopolize the karaoke track market. Doc. 151 at 11-13. As just noted, Slep-Tone's ¶¶ 56-61 and 63-67 have been admitted, establishing that Defendants have no evidence to support assertions essential to their Sherman Act counterclaims. *See Sanderson v. Culligan Int'l Co.*, 415 F.3d 620, 622 (7th Cir. 2005) (noting that liability under § 1 requires an agreement and that liability under § 2 requires "a dangerous probability of monopolization"). This is fatal to those counterclaims. *See Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014) (holding that where the movant meets its "burden" of "showing … that there is an absence of evidence to support the nonmoving party's case," the non-movant "must make a showing sufficient to establish the existence of an element essential to that party's case") (internal quotation marks omitted).

Slep-Tone argues that the counterclaim under the Robinson-Patman Act (which is part of the Clayton Act) fails because there is no evidence that it charged different prices for the same good with the effect of harming competition. Defendants have attempted to present at least some evidence that Slep-Tone sold its products at different prices—a one-page document that sets forth pricing terms for Slep-Tone's "HELP Licensing Program." Doc. 164 at ¶ 62 (citing Doc. 163-4). But that document does not create a genuine issue of material fact.

As relevant here, the Robinson-Patman Act "makes it illegal to discriminate in price when an injury to competition is the consequence." *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 521 (7th Cir. 2011). Although Defendants submit that Slep-Tone charged different prices under the HELP Licensing Program for operator licenses and venue licenses, the Robinson-Patman Act prohibits price discrimination only with respect to "commodities of like grade and quality." 15 U.S.C. § 13(a); *see First Comics, Inc. v. World Color Press, Inc.*, 884 F.2d 1033, 1035-38 (7th Cir. 1989). A license to use media-shifted tracks is not a commodity. *See Innomed Labs, LLC v. ALZA Corp.*, 368 F.3d 148, 161 n.4 (2d Cir. 2004) ("contracts that explicitly grant a license to exploit the intellectual property contained in a commodity have been viewed as primarily concerned with intangible rights, and are therefore not covered by the [Robinson-Patman] Act") (citing *La Salle Street Press, Inc. v. McCormick & Henderson, Inc.*, 293 F. Supp. 1004, 1006 (N.D. Ill 1968), *aff'd in part and rev'd in part on other grounds*, 445 F.2d 84 (7th Cir. 1971)); *Ambook Enters. v. Time Inc.*, 612 F.2d 604, 609 & n.6 (2d Cir. 1979); *Linzer Prods. Corp. v. Sekar*, 499 F. Supp. 2d 540, 556 (S.D.N.Y. 2007) (holding that a patent licensing agreement is not a commodity under the Clayton Act); *see also Freeman v. Chi. Title & Tr. Co.*, 505 F.2d 527, 529 (7th Cir. 1974) ("The courts have consistently interpreted the provisions of the Robinson-Patman Act as being restricted to translations involving tangible

products."); *Baum v. Investors Diversified Servs., Inc.*, 409 F.2d 872, 875 (7th Cir. 1969) ("the word 'commodity' as used in the Clayton Act is restricted to products, merchandise, or other tangible goods") (collecting cases).

Even putting that aside, "Robinson-Patman does not ban all price differences charged to different purchasers of commodities of like grade and quality; rather, the Act proscribes price discrimination only to the extent that it threatens to injure competition." *Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 166 (2006) (internal quotation marks omitted); *see also Dynegy Mktg.*, 648 F.3d at 521-22. As a court has explained in a materially identical Slep-Tone case, there are three categories of competitive injury—primary line, secondary line, and tertiary line, *see Dynegy Mktg.*, 648 F.3d at 521 n.2—each of which "has specific elements and involves different conduct and injuries." *Slep-Tone Entm't Corp. v. Kalamata, Inc.*, 75 F. Supp. 3d 898, 908 (N.D. Ill. 2014) (citing *Volvo Trucks*, 546 U.S. at 176). Yet Defendants do not identify which category of injury they believe is in play, must less show how Slep-Tone's license pricing satisfies the pertinent elements. *See ibid.* (dismissing similar antitrust claims for failure to allege facts that fall under any of the three categories). The court will not make Defendants' argument for them. *See Isr. Travel Advisory Serv., Inc. v. Isr. Identity Tours, Inc.*, 61 F.3d 1250, 1254 (7th Cir. 1995) ("[w]e do not invent arguments for the parties in civil litigation"). Accordingly, Slep-Tone is entitled to judgment on the Robinson-Patman counterclaim as well.

### 3. Tortious Interference with Contract

Under Illinois law, the elements of tortious interference with contract are: "(1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified

inducement of a breach of the contract; (4) a subsequent breach by the other, caused by defendant's wrongful conduct; and (5) damages." *Voelker v. Porsche Cars N. Am., Inc.*, 353 F.3d 516, 527 (7th Cir. 2003) (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 676 (Ill. 1989)) (internal quotation marks omitted). Slep-Tone seeks summary judgment on the tortious interference counterclaim on the ground that Defendants have failed to adduce evidence on the first element, that a valid contract exists between Defendants and the karaoke venues. Doc. 151 at 14. As shown above, Defendants are deemed to have admitted Slep-Tone's ¶¶ 70-71, which assert that "[t]here is no evidence that Defendants had, or currently have any contracts, oral or written, with venues for its services," and that "[t]here is no evidence that based upon an oral contract, Potato Creek Johnny's required Defendants to perform services twice a week, on Tuesdays and Thursdays." Because Defendants have no evidence on that element, Slep-Tone is entitled to judgment on the tortious interference counterclaim. *See Sterk*, 770 F.3d at 627.

There is an alternative ground for summary judgment: the actions that Defendants believe constitute tortious interference—Slep-Tone's bringing this suit and its demand that karaoke venues not employ infringing KJs—are privileged because they relate to Slep-Tone's interest in protecting its trademarks. Doc. 151 at 14-15; *see Capital Options Invs., Inc. v. Goldberg Bros. Commodities, Inc.*, 958 F.2d 186, 189 (7th Cir. 1992) (for a tortious interference claim to succeed, "the evidence must establish that the individual acted with a desire to harm which was unrelated to the interest he was presumably seeking to protect by bringing about the contract breach") (quoting *Langer v. Becker*, 531 N.E.2d 830, 834 (Ill. App. 1988)) (internal quotation marks omitted). Slep-Tone made this same argument when it moved under Rule 12(b)(6) to dismiss the counterclaim. Doc. 61 at 15. Defendants did not respond to the argument, so the

32

court deemed the issue forfeited and granted dismissal. 2015 WL 127836, at *5. Now, having repleaded a materially identical counterclaim, *compare* Doc. 103 at ¶¶ 117-129 *with* Doc. 53 at ¶¶ 92-100, Defendants once again demur. Instead of arguing that that the evidence would allow a jury to find for them on the privilege issue, "Defendants maintain that [Slep-Tone] ha[s] never pled the affirmative defense of privilege and as such that defense is waived. … [A]s [Slep-Tone] ha[s] decided to plead an affirmative defense for the first time in their Motion for Summary Judgment, Defendants are unable to address the matter further." Doc. 163 at 11.

This argument fails. Defendants have been on notice since July 18, 2014, when Slep-Tone moved to dismiss the original tortious interference counterclaim, that Slep-Tone was relying on the above-referenced privilege. Doc. 61 at 15. Given this, Defendants cannot plausibly maintain that the defense is waived. *See Curtis v. Timberlake*, 436 F.3d 709, 711 (7th Cir. 2005) ("a delay in asserting an affirmative defense waives the defense only if the plaintiff was harmed as a result"); *Carter v. United States*, 333 F.3d 791, 796 (7th Cir. 2003) ("The failure to plead an affirmative defense in the answer works a forfeiture only if the plaintiff is harmed by the defendant's delay in asserting it."); *Massey v. Helman*, 196 F.3d 727, 735 (7th Cir. 1999) (holding that because "Defendants provided [the plaintiff] with ample notice of their intent to use [an] affirmative defense … defendants' failure to raise [that defense] did not constitute a waiver."). And because Defendants do not respond on the merits to Slep-Tone's defense, summary judgment on the tortious interference counterclaim is warranted. *See Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment."); *Domka v. Portage Cnty.*, 523 F.3d 776, 783 (7th Cir. 2008) ("It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the

reasons, legal or factual, why summary judgment should not be entered.") (internal quotation marks omitted); *Keck Garrett & Assocs., Inc. v. Nextel Commc'ns, Inc.*, 517 F.3d 476, 487 (7th Cir. 2008) ("Nextel specifically requested summary judgment on the quantum meruit claim. Keck Garrett, however, did not defend that claim in its reply to Nextel's motion for summary judgment. By failing to present its argument to the district court, Keck Garrett abandoned its claim."); *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 407 (7th Cir. 2007) ("We agree with the district court's determination that [the plaintiff] waived (forfeited would be the better term) his discrimination claim by devoting only a skeletal argument in response to [the defendant's] motion for summary judgment."), *aff'd on other grounds*, 553 U.S. 442 (2008).

## II.    Slep-Tone's Sanctions Motion

After the court dismissed most of the original counterclaims, Slep-Tone moved to sanction Defendants for filing what it deemed to be frivolous antitrust, tortious interference, abuse of process, defamation, and common law fraud counterclaims. Doc. 96. Defendants then filed amended counterclaims, which repleaded the antitrust and tortious interference counterclaims, Doc. 103, and the court entered and continued the sanctions motion until the pleadings settled, Doc. 105. Slep-Tone ultimately did not move to dismiss the amended counterclaims, but instead answered and sought summary judgment. Docs. 142, 151. Because Slep-Tone may wish to reconsider or reformulate, at least in part, its sanctions motion in light of today's ruling and the evidence that Defendants adduced (or not) to support their counterclaims, the court will deny the sanctions motion without prejudice. If Slep-Tone still believes that the counterclaims were frivolous in whole or in part, it may file another sanctions motion, to which Defendants will be given a fresh chance to respond.

**Conclusion**

For the foregoing reasons, Slep-Tone's motion for summary judgment on its claims, Doc. 113, is denied; Slep-Tone's motion for summary judgment on Defendants' counterclaims, Doc. 151, is granted with respect to the antitrust and tortious interference counterclaims (Counterclaims VI and VII) and otherwise denied; and Defendants' motion for partial summary judgment on its cancellation counterclaims, Doc. 145, is denied.  The parties' motions to strike, Docs. 156, 160, 170, are granted in part, denied in part, and denied as moot in part.  Slep-Tone's sanctions motion, Doc. 96, is denied without prejudice to renewal in light of the summary judgment record and ruling.

September 30, 2015

_____

United States District Judge